[No. S087859. May 2, 2002.]

MARC KASKY, Plaintiff and Appellant, v.
NIKE, INC., et al., Defendants and Respondents.

**COUNSEL**

Law Offices of Paul R. Hoeber, Paul R. Hoeber; Bushnell, Caplan & Fielding, Alan M. Caplan, Philip Neumark, Roderick P. Bushnell; Milberg Weiss Bershad Hynes & Lerach, William S. Lerach, Patrick J. Coughlin,

Albert H. Meyerhoff, Frank J. Janecek, Jr., and Patrick W. Daniels for Plaintiff and Appellant.

Bill Lockyer, Attorney General, Richard M. Frank, Chief Assistant Attorney General, Herschel T. Elkins and Louis Verdugo, Assistant Attorneys General, Ronald A. Reiter, Phyllis Cheng and Michele R. Van Gelderen, Deputy Attorneys General, as Amici Curiae on behalf of Plaintiff and Appellant.

Law Offices of Carroll & Scully, Charles P. Scully II and Donald C. Carroll for California Labor Federation, AFL-CIO as Amicus Curiae on behalf of Plaintiff and Appellant.

Aaron Isherwood for the Sierra Club, Environmental Defense and California Certified Organic Farmers as Amici Curiae on behalf of Plaintiff and Appellant.

Brobeck, Phleger & Harrison, David J. Brown, James N. Penrod and Robert P. Varian for Defendants and Respondents.

Deborah J. La Fetra and Mark T. Gallagher for Pacific Legal Foundation as Amicus Curiae on behalf of Defendants and Respondents.

Cadwalader, Wickersham & Taft, Steven G. Brody; Preuss Shanagher Zvoleff & Zimmer and Alan J. Lazarus for Product Liability Advisory Council, Inc., as Amicus Curiae on behalf of Defendants and Respondents.

Fred J. Hiestand for the Civil Justice Association of California as Amicus Curiae on behalf of Defendants and Respondents.

Ann Brick for American Civil Liberties Union of Northern California, Inc., as Amicus Curiae on behalf of Defendants and Respondents.

## OPINION

**KENNARD, J.**—Acting on behalf of the public, plaintiff brought this action seeking monetary and injunctive relief under California laws designed to curb false advertising and unfair competition. Plaintiff alleged that defendant corporation, in response to public criticism, and to induce consumers to continue to buy its products, made false statements of fact about its labor practices and about working conditions in factories that make its products. Applying established principles of appellate review, we must assume in this opinion that these allegations are true.

The issue here is whether defendant corporation's false statements are commercial or noncommercial speech for purposes of constitutional free speech analysis under the state and federal Constitutions. Resolution of this issue is important because commercial speech receives a lesser degree of constitutional protection than many other forms of expression, and because governments may entirely prohibit commercial speech that is false or misleading.

Because the messages in question were directed by a commercial speaker to a commercial audience, and because they made representations of fact about the speaker's own business operations for the purpose of promoting sales of its products, we conclude that these messages are commercial speech for purposes of applying state laws barring false and misleading commercial messages. Because the Court of Appeal concluded otherwise, we will reverse its judgment.

Our holding, based on decisions of the United States Supreme Court, in no way prohibits any business enterprise from speaking out on issues of public importance or from vigorously defending its own labor practices. It means only that when a business enterprise, to promote and defend its sales and profits, makes factual representations about its own products or its own operations, it must speak truthfully. Unlike our dissenting colleagues, we do not consider this a remarkable or intolerable burden to impose on the business community. We emphasize that this lawsuit is still at a preliminary stage, and that whether any false representations were made is a disputed issue that has yet to be resolved.

## I. FACTS

This case comes before us after the superior court sustained defendants' demurrers to plaintiff's first amended complaint. We therefore begin by summarizing that complaint's allegations, accepting the truth of the allegations, as we must, for the limited purposes of reviewing the superior court's ruling. (See *Stevenson v. Superior Court* (1997) 16 Cal.4th 880, 885 [66 Cal.Rptr.2d 888, 941 P.2d 1157]; accord, *Charles J. Vacanti, M.D., Inc. v. State Comp. Ins. Fund* (2001) 24 Cal.4th 800, 807 [102 Cal.Rptr.2d 562, 14 P.3d 234]; *Santa Monica Beach, Ltd. v. Superior Court* (1999) 19 Cal.4th 952, 957 [81 Cal.Rptr.2d 93, 968 P.2d 993].)

### A. *Allegations of the First Amended Complaint*

Plaintiff Marc Kasky is a California resident suing on behalf of the general public of the State of California under Business and Professions

Code sections 17204 and 17535.[1] Defendant Nike, Inc. (Nike) is an Oregon corporation with its principal place of business in that state; Nike is authorized to do business in California and does promote, distribute, and sell its products in this state. The individual defendants (Philip Knight, Thomas Clarke, Mark Parker, Stephen Gomez, and David Taylor) are officers and/or directors of Nike.

Nike manufactures and sells athletic shoes and apparel. In 1997, it reported annual revenues of $9.2 billion, with annual expenditures for advertising and marketing of almost $1 billion. Most of Nike's products are manufactured by subcontractors in China, Vietnam, and Indonesia. Most of the workers who make Nike products are women under the age of 24. Since March 1993, under a memorandum of understanding with its subcontractors, Nike has assumed responsibility for its subcontractors' compliance with applicable local laws and regulations concerning minimum wage, overtime, occupational health and safety, and environmental protection.

Beginning at least in October 1996 with a report on the television news program *48 Hours*, and continuing at least through November and December of 1997 with the publication of articles in the Financial Times, the New York Times, the San Francisco Chronicle, the Buffalo News, the Oregonian, the Kansas City Star, and the Sporting News, various persons and organizations alleged that in the factories where Nike products are made workers were paid less than the applicable local minimum wage; required to work overtime; allowed and encouraged to work more overtime hours than applicable local law allowed; subjected to physical, verbal, and sexual abuse; and exposed to toxic chemicals, noise, heat, and dust without adequate safety equipment, in violation of applicable local occupational health and safety regulations.

In response to this adverse publicity, and for the purpose of maintaining and increasing its sales and profits, Nike and the individual defendants made statements to the California consuming public that plaintiff alleges were false and misleading. Specifically, Nike and the individual defendants said that workers who make Nike products are protected from physical and sexual abuse, that they are paid in accordance with applicable local laws and regulations governing wages and hours, that they are paid on average double the applicable local minimum wage, that they receive a "living wage," that they receive free meals and health care, and that their working conditions are in compliance with applicable local laws and regulations governing occupational health and safety. Nike and the individual defendants made these

---

[1]Except as otherwise noted, unlabeled section references are to the Business and Professions Code.

statements in press releases, in letters to newspapers, in a letter to university presidents and athletic directors, and in other documents distributed for public relations purposes. Nike also bought full-page advertisements in leading newspapers to publicize a report that GoodWorks International, LLC, had prepared under a contract with Nike. The report was based on an investigation by former United States Ambassador Andrew Young, and it found no evidence of illegal or unsafe working conditions at Nike factories in China, Vietnam, and Indonesia.

Plaintiff alleges that Nike and the individual defendants made these false and misleading statements because of their negligence and carelessness and "with knowledge or reckless disregard of the laws of California prohibiting false and misleading statements."

### B. *Superior Court Proceedings*

Based on these factual allegations, plaintiff's first amended complaint sought relief in the form of restitution requiring Nike to "disgorge all monies . . . acquired by means of any act found . . . to be an unlawful and/or unfair business practice," and relief in the form of an injunction requiring Nike to "undertake a Court-approved public information campaign" to correct any false or misleading statement, and to cease misrepresenting the working conditions under which Nike products are made. Plaintiff also sought reasonable attorney fees and costs and other relief that the court deemed just and proper.

Nike demurred to the first amended complaint on grounds, among others, that it failed to state facts sufficient to constitute a cause of action against Nike and that the relief plaintiff was seeking "is absolutely barred by the First Amendment to the United States Constitution and Article I, section 2(a) of the California Constitution." The individual defendants separately demurred to the first amended complaint on the same grounds.

On January 7, 1999, the superior court held a hearing on defendants' demurrers. At the hearing, the court stated that it considered the crucial question to be whether Nike's allegedly false and misleading statements noted in the first amended complaint constituted commercial or noncommercial speech, because the answer to this question would determine the amount of protection the statements would receive under the federal and state constitutional free speech guarantees. After considering the arguments and authorities submitted by the parties, the court took the matter under submission and later sustained the demurrers without leave to amend. Plaintiff appealed from the judgment dismissing the complaint.

## C. *Court of Appeal Proceedings*

The Court of Appeal affirmed the judgment. Like the superior court, the appellate court identified as the crucial issue whether Nike's allegedly false and misleading statements were commercial or noncommercial speech for purposes of analyzing the protections afforded by the First Amendment to the federal Constitution and by article I, section 2 of the California Constitution. Also like the superior court, the appellate court concluded that Nike's statements were noncommercial speech and therefore subject to the greatest measure of protection under the constitutional free speech provisions. The court stated that this determination "compels the conclusion that the trial court properly sustained the defendants' demurrer without leave to amend." We granted plaintiff's petition for review.

## II. CALIFORNIA LAWS PROHIBITING CONSUMER DECEPTION

### A. *The Unfair Competition Law*

■ California's unfair competition law (UCL) (§ 17200 et seq.) defines "unfair competition" to mean and include "any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising and any act prohibited by [the false advertising law (§ 17500 et seq.)]." (§ 17200.) The UCL's purpose is to protect both consumers and competitors by promoting fair competition in commercial markets for goods and services. (*Barquis v. Merchants Collection Assn.* (1972) 7 Cal.3d 94, 110 [101 Cal.Rptr. 745, 496 P.2d 817].)

The UCL's scope is broad. By defining unfair competition to include any "*unlawful . . .* business act or practice" (§ 17200, italics added), the UCL permits violations of other laws to be treated as unfair competition that is independently actionable. (*Cel-Tech Communications, Inc. v. Los Angeles Cellular Telephone Co.* (1999) 20 Cal.4th 163, 180 [83 Cal.Rptr.2d 548, 973 P.2d 527].) Here, for instance, plaintiff's first amended complaint alleged that Nike and the individual defendants violated the UCL by committing actual fraud as defined in and prohibited by Civil Code section 1572 and deceit as defined in and prohibited by Civil Code sections 1709 and 1710. By defining unfair competition to include also any "*unfair or fraudulent* business act or practice" (§ 17200, italics added), the UCL sweeps within its scope acts and practices not specifically proscribed by any other law. (*Cel-Tech Communications, Inc. v. Los Angeles Cellular Telephone Co., supra,* at p. 180.) Plaintiff's first amended complaint also alleged a UCL violation of this type.

■ Not only public prosecutors, but also "any person acting for the interests of . . . the general public," may bring an action for relief under the

UCL. (§ 17204.) Under this provision, a private plaintiff may bring a UCL action even when "the conduct alleged to constitute unfair competition violates a statute for the direct enforcement of which there is no private right of action." (*Stop Youth Addiction, Inc. v. Lucky Stores, Inc.* (1998) 17 Cal.4th 553, 565 [71 Cal.Rptr.2d 731, 950 P.2d 1086].) "This court has repeatedly recognized the importance of these private enforcement efforts." (*Kraus v. Trinity Management Services, Inc.* (2000) 23 Cal.4th 116, 126 [96 Cal.Rptr.2d 485, 999 P.2d 718].)

In a suit under the UCL, a public prosecutor may collect civil penalties, but a private plaintiff's remedies are "generally limited to injunctive relief and restitution." (*Cel-Tech Communications, Inc. v. Los Angeles Cellular Telephone Co., supra,* 20 Cal.4th at p. 179; see §§ 17203, 17206; *ABC Internat. Traders, Inc. v. Matsushita Electric Corp.* (1997) 14 Cal.4th 1247, 1268 [61 Cal.Rptr.2d 112, 931 P.2d 290].) An order for restitution is one "compelling a UCL defendant to return money obtained through an unfair business practice to those persons in interest from whom the property was taken." (*Kraus v. Trinity Management Services, Inc., supra,* 23 Cal.4th at pp. 126-127.)

### B. *The False Advertising Law*

■ California's false advertising law (§ 17500 et seq.) makes it "unlawful for any person, . . . corporation . . . , or any employee thereof with intent directly or indirectly to dispose of real or personal property or to perform services . . . or to induce the public to enter into any obligation relating thereto, to make or disseminate . . . before the public in this state, . . . in any newspaper or other publication . . . or in any other manner or means whatever . . . any statement, concerning that real or personal property or those services . . . which is untrue or misleading, and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading . . . ." (§ 17500.) Violation of this provision is a misdemeanor. (*Ibid.*) As with the UCL, an action for violation of the false advertising law may be brought either by a public prosecutor or by "any person acting for the interests of itself, its members or the general public," and the remedies available to a successful private plaintiff include restitution and injunctive relief. (§ 17535.)

### C.· *Common Features of the UCL and the False Advertising Law*

■ This court has recognized that "[a]ny violation of the false advertising law . . . necessarily violates" the UCL. (*Committee on Children's Television, Inc. v. General Foods Corp.* (1983) 35 Cal.3d 197, 210 [197

Cal.Rptr. 783, 673 P.2d 660].) We have also recognized that these laws prohibit "not only advertising which is false, but also advertising which[,] although true, is either actually misleading or which has a capacity, likelihood or tendency to deceive or confuse the public." (*Leoni v. State Bar* (1985) 39 Cal.3d 609, 626 [217 Cal.Rptr. 423, 704 P.2d 183].) Thus, to state a claim under either the UCL or the false advertising law, based on false advertising or promotional practices, "it is necessary only to show that 'members of the public are likely to be deceived.'" (*Committee on Children's Television, Inc. v. General Foods Corp., supra,* 35 Cal.3d at p. 211; accord, *Bank of the West v. Superior Court* (1992) 2 Cal.4th 1254, 1267 [10 Cal.Rptr.2d 538, 833 P.2d 545].)

### III. Constitutional Protections for Speech

#### A. Federal Constitution

##### 1. Constitutional text and its application to state laws

The United States Constitution's First Amendment, part of the Bill of Rights, provides in part that "Congress shall make no law . . . abridging the freedom of speech . . . ." (U.S. Const., 1st Amend.) ▮ Although by its terms this provision limits only Congress, the United States Supreme Court has held that the Fourteenth Amendment's due process clause makes the freedom of speech provision operate to limit the authority of state and local governments as well. (*McIntyre v. Ohio Elections Comm'n* (1995) 514 U.S. 334, 336, fn. 1 [115 S.Ct. 1511, 1514, 131 L.Ed.2d 426].)

##### 2. Constitutional protection of commercial speech

Although advertising has played an important role in our nation's culture since its early days, and although state regulation of commercial advertising and commercial transactions also has a long history, it was not until the 1970's that the United States Supreme Court extended First Amendment protection to commercial messages. In 1975, the court declared that it was error to assume "that advertising, as such, was entitled to no First Amendment protection." (*Bigelow v. Virginia* (1975) 421 U.S. 809, 825 [95 S.Ct. 2222, 2234, 44 L.Ed.2d 600].) The next year, the court held that a state's complete ban on advertising prescription drug prices violated the First Amendment. (*Va. Pharmacy Bd. v. Va. Consumer Council* (1976) 425 U.S. 748, 770 [96 S.Ct. 1817, 1829-1830, 48 L.Ed.2d 346].) The high court observed that "the free flow of commercial information is indispensable" not only "to the proper allocation of resources in a free enterprise system" but also "to the formation of intelligent opinions as to how that system ought to be regulated or altered." (*Id.* at p. 765 [96 S.Ct. at p. 1827].)

### 3. *Tests for commercial and noncommercial speech regulations*

■ "[T]he [federal] Constitution accords less protection to commercial speech than to other constitutionally safeguarded forms of expression." (*Bolger v. Youngs Drug Products Corp.* (1983) 463 U.S. 60, 64-65 [103 S.Ct. 2875, 2878-2879, 77 L.Ed.2d 469] (*Bolger*).)

For noncommercial speech entitled to full First Amendment protection, a content-based regulation is valid under the First Amendment only if it can withstand strict scrutiny, which requires that the regulation be narrowly tailored (that is, the least restrictive means) to·promote a compelling government interest. (*United States v. Playboy Entertainment Group, Inc.* (2000) 529 U.S. 803, 813 [120 S.Ct. 1878, 1886, 146 L.Ed.2d 865]; *Consolidated Edison Co. v. Public Serv. Comm'n* (1980) 447 U.S. 530, 540 [100 S.Ct. 2326, 2334-2335, 65 L.Ed.2d 319].)

"By contrast, regulation of commercial speech based on content is less problematic." (*Bolger, supra,* 463 U.S. at p. 65 [103 S.Ct. at p. 2879].) To determine the validity of a content-based regulation of commercial speech, the United States Supreme Court has articulated an intermediate-scrutiny test. The court first articulated this test in *Central Hudson Gas & Elec. v. Public Serv. Comm'n* (1980) 447 U.S. 557 [100 S.Ct. 2343, 65 L.Ed.2d 341] (*Central Hudson*) and has since referred to it as the *Central Hudson* test. The court explained the components of the test this way: "At the outset, we must determine whether the expression is protected by the First Amendment. *For commercial speech to come within that provision, it at least must concern lawful activity and not be misleading.* Next, we ask whether the asserted governmental interest is substantial. If both inquiries yield positive answers, we must determine whether the regulation directly advances the governmental interest asserted, and whether it is not more extensive than is necessary to serve that interest." (*Id.* at p. 566 [100 S.Ct. at p. 2351], italics added; accord, *Lorillard Tobacco Co. v. Reilly* (2001) 533 U.S. 525, 554 [121 S.Ct. 2404, 2421, 150 L.Ed.2d 532]; *Greater New Orleans Broadcasting Assn., Inc. v. United States* (1999) 527 U.S. 173, 183 [119 S.Ct. 1923, 1929-1930, 144 L.Ed.2d 161, 164 A.L.R.Fed. 711].) The court has clarified that the last part of the test—determining whether the regulation is not more extensive than "necessary"—does not require the government to adopt the least restrictive means, but instead requires only a "reasonable fit" between the government's purpose and the means chosen to achieve it. (*Board of Trustees, State Univ. of N. Y. v. Fox* (1989) 492 U.S. 469, 480 [109 S.Ct. 3028, 3034-3035, 106 L.Ed.2d 388].)

### 4. Regulation of false or misleading speech

■ "[T]here is no constitutional value in false statements of fact. Neither the intentional lie nor the careless error materially advances society's interest in 'uninhibited, robust, and wide-open' debate on public issues." (*Gertz v. Robert Welch, Inc.* (1974) 418 U.S. 323, 340 [94 S.Ct. 2997, 3007, 41 L.Ed.2d 789].) For this reason, "[u]ntruthful speech, commercial or otherwise, has never been protected for its own sake." (*Va. Pharmacy Bd. v. Va. Consumer Council, supra,* 425 U.S. at p. 771 [96 S.Ct. at p. 1830].)

Nevertheless, in some instances the First Amendment imposes restraints on lawsuits seeking damages for injurious falsehoods. It does so "to eliminate the risk of undue self-censorship and the suppression of truthful material" (*Herbert v. Lando* (1979) 441 U.S. 153, 172 [99 S.Ct. 1635, 1646, 60 L.Ed.2d 115]) and thereby to give freedom of expression the " 'breathing space' " it needs to survive (*New York Times Co. v. Sullivan* (1964) 376 U.S. 254, 272 [84 S.Ct. 710, 721-722, 11 L.Ed.2d 686, 95 A.L.R.2d 1412]; *Bose Corp. v. Consumers Union of U.S., Inc.* (1984) 466 U.S. 485, 513 [104 S.Ct. 1949, 1966-1967, 80 L.Ed.2d 502]). Thus, "some false and misleading statements are entitled to First Amendment protection in the political realm." (*Rubin v. Coors Brewing Co.* (1995) 514 U.S. 476, 495 [115 S.Ct. 1585, 1596-1597, 131 L.Ed.2d 532] (conc. opn. of Stevens, J.).)

■ But the United States Supreme Court has explained that the First Amendment's protection for false statements is not universal. (See *Dun & Bradstreet, Inc. v. Greenmoss Builders* (1985) 472 U.S. 749, 762 [105 S.Ct. 2939, 2946-2947, 86 L.Ed.2d 593] (plur. opn. of Powell, J.) [stating that when speech "concerns no public issue" and is "wholly false and clearly damaging," it "warrants no special protection" under the First Amendment].) In particular, commercial speech that is false or misleading is not entitled to First Amendment protection and "may be prohibited entirely." (*In re R.M.J.* (1982) 455 U.S. 191, 203 [102 S.Ct. 929, 937-938, 71 L.Ed.2d 64]; see also *Edenfield v. Fane* (1993) 507 U.S. 761, 768 [113 S.Ct. 1792, 1799, 123 L.Ed.2d 543] [observing that "the State may ban commercial expression that is fraudulent or deceptive without further justification"]; *Bolger, supra,* 463 U.S. at p. 69 [103 S.Ct. at p. 2881] [observing that "[t]he State may deal effectively with false, deceptive, or misleading sales techniques"]; *Zauderer v. Office of Disciplinary Counsel* (1985) 471 U.S. 626, 638 [105 S.Ct. 2265, 2275, 85 L.Ed.2d 652] [observing that "[t]he States and the Federal Government are free to prevent the dissemination of commercial speech that is false, deceptive, or misleading"]; *Central Hudson, supra,* 447 U.S. at p. 566 [100 S.Ct. at p. 2351] [stating that for commercial speech to come within First Amendment protection "it . . . must . . . not be misleading"]; *Bates v.*

*State Bar of Arizona* (1977) 433 U.S. 350, 383 [97 S.Ct. 2691, 2709, 53 L.Ed.2d 810] [stating that "the leeway for untruthful or misleading expression that has been allowed in other contexts has little force in the commercial arena"].)

With regard to misleading commercial speech, the United States Supreme Court has drawn a distinction between, on the one hand, speech that is actually or inherently misleading, and, on the other hand, speech that is only potentially misleading. Actually or inherently misleading commercial speech is treated the same as false commercial speech, which the state may prohibit entirely. (*In re R.M.J., supra,* 455 U.S. at p. 203 [102 S.Ct. at pp. 937-938]; *Ibanez v. Florida Dept. of Business and Professional Regulation, Bd. of Accountancy* (1994) 512 U.S. 136, 150 [114 S.Ct. 2084, 2092-2093, 129 L.Ed.2d 118].) By comparison, "[s]tates may not completely ban potentially misleading speech if narrower limitations can ensure that the information is presented in a nonmisleading manner." (*Ibanez v. Florida Dept. of Business and Professional Regulation, Bd. of Accountancy, supra,* at p. 152 [114 S.Ct. at p. 2093]; see also *Peel v. Attorney Disciplinary Comm'n of Ill.* (1990) 496 U.S. 91, 100 [110 S.Ct. 2281, 2287-2288, 110 L.Ed.2d 83]; *In re R.M.J., supra,* at p. 203 [102 S.Ct. at pp. 937-938].)

As one Supreme Court Justice has remarked, "the elimination of false and deceptive claims serves to promote the one facet of commercial price and product advertising that warrants First Amendment protection—its contribution to the flow of accurate and reliable information relevant to public and private decisionmaking." (*Va. Pharmacy Bd. v. Va. Consumer Council, supra,* 425 U.S. at p. 781 [96 S.Ct. at p. 1835] (conc. opn. of Stewart, J.); see also *44 Liquormart, Inc. v. Rhode Island* (1996) 517 U.S. 484, 496, 501 [116 S.Ct. 1495, 1504-1505, 1507, 134 L.Ed.2d 711] (plur. opn. of Stevens, J.).) Thus, the high court has acknowledged that state laws may require a commercial message to "appear in such a form, or include such additional information, warnings, and disclaimers, as are necessary to prevent its being deceptive." (*Va. Pharmacy Bd. v. Va. Consumer Council, supra,* 425 U.S. at p. 772, fn. 24 [96 S.Ct. at p. 1830].) In the court's words, "[t]he First Amendment . . . does not prohibit the State from insuring that the stream of commercial information flow[s] cleanly as well as freely." (*Id.* at pp. 771-772 [96 S.Ct. at pp. 1830-1831].)

## 5. *Reasons for the distinction*

The United States Supreme Court has given three reasons for the distinction between commercial and noncommercial speech in general and, more particularly, for withholding First Amendment protection from commercial speech that is false or actually or inherently misleading.

First, "[t]he truth of commercial speech . . . may be *more easily verifiable by its disseminator* than . . . news reporting or political commentary, in that ordinarily the advertiser seeks to disseminate information about a specific product or service that he himself provides and presumably knows more about than anyone else." (*Va. Pharmacy Bd. v. Va. Consumer Council, supra,* 425 U.S. at p. 772, fn. 24 [96 S.Ct. at p. 1830], italics added; see also *id.* at p. 777 [96 S.Ct. at p. 1833] (conc. opn. of Stewart, J.) [stating that "[t]he advertiser's access to the truth about his product and its price substantially eliminates any danger that governmental regulation of false or misleading price or product advertising will chill accurate and nondeceptive commercial expression"]; accord, *44 Liquormart, Inc. v. Rhode Island, supra,* 517 U.S. at p. 499 [116 S.Ct. at p. 1506] (plur. opn. of Stevens, J.); *Dun & Bradstreet, Inc. v. Greenmoss Builders, supra,* 472 U.S. at p. 758, fn. 5 [105 S.Ct. at pp. 2944-2945] (plur. opn. of Powell, J.); *Bose Corp. v. Consumers Union of U.S., Inc., supra,* 466 U.S. at p. 504, fn. 22 [104 S.Ct. at pp. 1961-1962].)

Second, commercial speech is *hardier* than noncommercial speech in the sense that commercial speakers, because they act from a profit motive, are less likely to experience a chilling effect from speech regulation. (*Va. Pharmacy Bd. v. Va. Consumer Council, supra,* 425 U.S. at pp. 771-772, fn. 24 [96 S.Ct. at p. 1830] [stating that "[s]ince advertising is the *sine qua non* of commercial profits, there is little likelihood of its being chilled by proper regulation and forgone entirely"]; accord, *44 Liquormart, Inc. v. Rhode Island, supra,* 517 U.S. at p. 499 [116 S.Ct. at p. 1506] (plur. opn. of Stevens, J.); *Board of Trustees, State Univ. of N.Y. v. Fox, supra,* 492 U.S. at p. 481 [109 S.Ct. at p. 3035]; *Dun & Bradstreet, Inc. v. Greenmoss Builders, supra,* 472 U.S. at p. 758, fn. 5 [105 S.Ct. at pp. 2944-2945] (plur. opn. of Powell, J.).)

Third, governmental authority to regulate commercial transactions to prevent commercial harms justifies a power to regulate speech that is " 'linked inextricably' to those transactions." (*44 Liquormart, Inc. v. Rhode Island, supra,* 517 U.S. at p. 499 [116 S.Ct. at p. 1506] (plur. opn. of Stevens, J.); *Edenfield v. Fane, supra,* 507 U.S. at p. 767 [113 S.Ct. at p. 1798]; *Friedman v. Rogers* (1979) 440 U.S. 1, 10, fn. 9 [99 S.Ct. 887, 894-895, 59 L.Ed.2d 100].) The high court has identified "preventing commercial harms" as "the typical reason why commercial speech can be subject to greater governmental regulation than noncommercial speech" (*Cincinnati v. Discovery Network, Inc.* (1993) 507 U.S. 410, 426 [113 S.Ct. 1505, 1515, 123 L.Ed.2d 99]), and it has explained that "[t]he interest in preventing commercial harms justifies more intensive regulation of commercial speech than noncommercial speech even when they are intermingled in the same publications" (*id.* at p. 426, fn. 21 [113 S.Ct. at p. 1515]). (See also *Rubin v.*

*Coors Brewing Co., supra,* 514 U.S. at p. 496 [115 S.Ct. at p. 1596] (conc. opn. of Stevens, J.) [stating that "[t]he evils of false commercial speech, which may have an immediate harmful impact on commercial transactions, together with the ability of purveyors of commercial speech to control falsehoods, explains why we tolerate more governmental regulation of this speech than of most other speech"].)

### 6. *Distinguishing commercial from noncommercial speech*

 The United States Supreme Court has stated that the category of commercial speech consists at its core of " 'speech proposing a commercial transaction.' " (*Central Hudson, supra,* 447 U.S. at p. 562 [100 S.Ct. at p. 2349]; *Bolger, supra,* 463 U.S. at p. 66 [103 S.Ct. at pp. 2879-2880].) Although in one case the court said that this description was "the test for identifying commercial speech" (*Board of Trustees, State Univ. of N.Y. v. Fox, supra,* 492 U.S. at pp. 473-474 [109 S.Ct. at p. 3031]), in other decisions the court has indicated that the category of commercial speech is not limited to this core segment. For example, the court has accepted as commercial speech a statement of alcohol content on the label of a beer bottle (*Rubin v. Coors Brewing Co., supra,* 514 U.S. at pp. 481-482 [115 S.Ct. at p. 1589]), as well as statements on an attorney's letterhead and business cards identifying the attorney as a CPA (certified public accountant) and CFP (certified financial planner) (*Ibanez v. Florida Dept. of Business and Professional Regulation, Bd. of Accountancy, supra,* 512 U.S. at p. 142 [114 S.Ct. at p. 2088]).

*Bolger, supra,* 463 U.S. 60, presented the United States Supreme Court with the question whether a federal law prohibiting the mailing of unsolicited advertisements for contraceptives violated the federal Constitution's free speech provision as applied to certain mailings by a corporation that manufactured, sold, and distributed contraceptives. One category of mailings consisted of "informational pamphlets discussing the desirability and availability of prophylactics in general or [the corporation's] products in particular." (*Id.* at p. 62 [103 S.Ct. at p. 2878], fn. omitted.) The court noted that these pamphlets did not merely propose commercial transactions. (*Id.* at p. 66 [103 S.Ct. at pp. 2879-2880].) Although the pamphlets were conceded to be advertisements, that fact alone did not make them commercial speech because paid advertisements are sometimes used to convey political or other messages unconnected to a product or service or commercial transaction. (*Ibid.,* citing *New York Times Co. v. Sullivan, supra,* 376 U.S. at pp. 265-266 [84 S.Ct. at pp. 718-719].) The court also found that references to specific products and the economic motivation of the speaker were each, considered in isolation, insufficient to make the pamphlets commercial speech. (*Bolger,*

*supra,* at pp. 66-67 [103 S.Ct. at pp. 2879-2880].) The court concluded, however, that the *combination* of these three factors—advertising format, product references, and commercial motivation—provided "strong support" for characterizing the pamphlets as commercial speech. (*Id.* at p. 67 [103 S.Ct. at p. 2880].)

In two important footnotes, the high court provided additional insight into the distinction between commercial and noncommercial speech. In one footnote, the court gave this caution: "[We do not] mean to suggest that each of the characteristics present in this case must necessarily be present in order for speech to be commercial. For example, we express no opinion as to whether reference to any particular product or service is a necessary element of commercial speech." (*Bolger, supra,* 463 U.S. at p. 67, fn. 14 [103 S.Ct. at pp. 2880-2881].)

In the other footnote, after observing that one of the pamphlets at issue discussed condoms in general without referring specifically to the corporation's own products, the court said: "That a product is referred to generically does not, however, remove it from the realm of commercial speech. For example, a company with sufficient control of the market for a product may be able to promote the product without reference to its own brand names. Or a trade association may make statements about a product without reference to specific brand names." (*Bolger, supra,* 463 U.S. at p. 66, fn. 13 [103 S.Ct. at p. 2880].)

Thus, although the court in *Bolger, supra,* 463 U.S. 60, identified three factors—advertising format, product references, and commercial motivation—that in combination supported a characterization of commercial speech in that case, the court not only rejected the notion that any of these factors is *sufficient* by itself, but it also declined to hold that all of these factors in combination, or any one of them individually, is *necessary* to support a commercial speech characterization.

The high court also cautioned, as it had in past cases, that statements may properly be categorized as commercial "notwithstanding the fact that they contain discussions of important public issues," and that "advertising which 'links a product to a current public debate' is not thereby entitled to the constitutional protection afforded noncommercial speech," explaining further that "[a]dvertisers should not be permitted to immunize false or misleading product information from government regulation simply by including references to public issues." (*Bolger, supra,* 463 U.S. at pp. 67-68 [103 S.Ct. at p. 2881], fn. omitted; accord, *Board of Trustees, State Univ. of N.Y. v. Fox, supra,* 492 U.S. 469, 475 [109 S.Ct. 3028, 3031-3032]; *Zauderer v.*

*Office of Disciplinary Counsel, supra,* 471 U.S. at p. 637, fn. 7 [105 S.Ct. at pp. 2274-2275]; see also *Greater New Orleans Broadcasting Assn., Inc. v. United States, supra,* 527 U.S. at p. 184 [119 S.Ct. at p. 1930] [recognizing that commercial speech may concern a "subject of intense public debate"].)

Since its decision in *Bolger, supra,* 463 U.S. 60, the United States Supreme Court has acknowledged that "ambiguities may exist at the margins of the category of commercial speech." (*Edenfield v. Fane, supra,* 507 U.S. at p. 765 [113 S.Ct. at p. 1797]; see also *Cincinnati v. Discovery Network, Inc., supra,* 507 U.S. at p. 419 [113 S.Ct. at p. 1511] [recognizing "the difficulty of drawing bright lines that will clearly cabin commercial speech in a distinct category"]; *Zauderer v. Office of Disciplinary Counsel, supra,* 471 U.S. at p. 637 [105 S.Ct. at p. 2274] [stating that "the precise bounds of the category of . . . commercial speech" are "subject to doubt, perhaps"].) Justice Stevens in particular has remarked that "the borders of the commercial speech category are not nearly as clear as the Court has assumed" (*Rubin v. Coors Brewing Co., supra,* 514 U.S. at p. 493 [115 S.Ct. at p. 1595] (conc. opn. of Stevens, J.)), and he has suggested that the distinction cannot rest solely on the form or content of the statement, or the motive of the speaker, but instead must rest on the relationship between the speech at issue and the justification for distinguishing commercial from noncommercial speech. In his words, "any description of commercial speech that is intended to identify the category of speech entitled to less First Amendment protection should relate to the reasons for permitting broader regulation: namely, commercial speech's potential to mislead." (*Id.* at p. 494 [115 S.Ct. at p. 1595] (conc. opn. of Stevens, J.).)

B. *The State Constitution*

1. *Constitutional text*

The California Constitution's article I, entitled Declaration of Rights, guarantees freedom of speech in subdivision (a) of section 2. It provides: "Every person may freely speak, write and publish his or her sentiments on all subjects, being responsible for the abuse of this right. A law may not restrain or abridge liberty of speech or press." (Cal. Const., art. I, § 2, subd. (a).)

2. *Scope of the state constitutional provision*

The state Constitution's free speech provision is "at least as broad" as (*Gerawan Farming, Inc. v. Lyons* (2000) 24 Cal.4th 468, 490 [101 Cal.Rptr.2d 470, 12 P.3d 720]) and in some ways is broader than (*id.* at

p. 491; *Blatty v. New York Times Co.* (1986) 42 Cal.3d 1033, 1041 [232 Cal.Rptr. 542, 728 P.2d 1177]) the comparable provision of the federal Constitution's First Amendment.

### 3. *Commercial speech protection under the state Constitution*

 The state Constitution's free speech provision, which provides that "[e]very person may freely speak . . . *on all subjects*" (Cal. Const., art. I, § 2, subd. (a), italics added), protects commercial speech, at least when such speech is "in the form of truthful and nonmisleading messages about lawful products and services." (*Gerawan Farming, Inc. v. Lyons, supra,* 24 Cal.4th at p. 493.) This court has indicated, however, that our state Constitution does not prohibit the imposition of sanctions for misleading commercial advertisements. (*In re Morse* (1995) 11 Cal.4th 184, 200, fn. 4 [44 Cal.Rptr.2d 620, 900 P.2d 1170].) Allowing such sanctions is consistent with the text of the state constitutional provision, which makes anyone who "abuse[s]" the right of freedom of speech "responsible" for the misconduct. (Cal. Const., art. I, § 2, subd. (a); see *Brown v. Kelly Broadcasting Co.* (1989) 48 Cal.3d 711, 746 [257 Cal.Rptr. 708, 771 P.2d 406].) Our Courts of Appeal have held that neither the UCL nor the false advertising law on its face violates the state Constitution's free speech provision as an impermissible regulation of commercial speech. (*People v. Superior Court (Olson)* (1979) 96 Cal.App.3d 181, 195 [157 Cal.Rptr. 628], cert. den. (1980) 446 U.S. 935 [100 S.Ct. 2152, 64 L.Ed.2d 787]; accord, *Keimer v. Buena Vista Books, Inc.* (1999) 75 Cal.App.4th 1220, 1230, fn. 10 [89 Cal.Rptr.2d 781].)

This court has never suggested that the state and federal Constitutions impose *different boundaries* between the categories of commercial and noncommercial speech. In our most recent decision on this point, *Leoni v. State Bar, supra,* 39 Cal.3d 609 (*Leoni*), this court addressed whether an attorney's solicitation of clients by means of allegedly misleading mass mailings and information was protected by the free speech provisions of the United States and California Constitutions. We used the same analysis for both constitutional provisions. (*Id.* at p. 614, fn. 2.) To determine whether the attorney's mailings were commercial or noncommercial speech, we relied on the three factors that the United States Supreme Court had used in *Bolger, supra,* 463 U.S. 60: advertising format, product references, and economic motivation. After concluding that two of these factors were present (because the mailings referred specifically to the attorney's services and the attorney had an economic motivation in sending them), we concluded that the presence of these two factors was sufficient to make the mailings commercial speech for purposes of the free speech protections of both the federal and the state Constitutions. (*Leoni, supra,* at pp. 623-624.)

## IV. ANALYSIS

### A. *The United States Constitution*

 The United States Supreme Court has not adopted an all-purpose test to distinguish commercial from noncommercial speech under the First Amendment, nor has this court adopted such a test under the state Constitution, nor do we propose to do so here. A close reading of the high court's commercial speech decisions suggests, however, that it is possible to formulate a limited-purpose test. We conclude, therefore, that *when a court must decide whether particular speech may be subjected to laws aimed at preventing false advertising or other forms of commercial deception*, categorizing a particular statement as commercial or noncommercial speech requires consideration of three elements: the speaker, the intended audience, and the content of the message.

In typical commercial speech cases, the *speaker* is likely to be someone engaged in commerce—that is, generally, the production, distribution, or sale of goods or services—or someone acting on behalf of a person so engaged, and the *intended audience* is likely to be actual or potential buyers or customers of the speaker's goods or services, or persons acting for actual or potential buyers or customers, or persons (such as reporters or reviewers) likely to repeat the message to or otherwise influence actual or potential buyers or customers. Considering the identity of both the speaker and the target audience is consistent with, and implicit in, the United States Supreme Court's commercial speech decisions, each of which concerned a speaker engaged in the sale or hire of products or services conveying a message to a person or persons likely to want, and be willing to pay for, that product or service. The high court has frequently spoken of commercial speech as speech proposing a commercial transaction (e.g., *Central Hudson, supra*, 447 U.S. at p. 562 [100 S.Ct. at p. 2349]), thus implying that commercial speech typically is communication between persons who engage in such transactions.

In *Bolger*, moreover, the court stated that in deciding whether speech is commercial, two relevant considerations are advertising format and economic motivation. (*Bolger, supra*, 463 U.S. at pp. 66-67 [103 S.Ct. at pp. 2879-2881].) These considerations imply that commercial speech generally or typically is directed to an audience of persons who may be influenced by that speech to engage in a commercial transaction with the speaker or the person on whose behalf the speaker is acting. Speech in advertising format typically, although not invariably, is speech about a product or service by a person who is offering that product or service at a price, directed to persons

who may want, and be willing to pay for, that product or service. Citing *New York Times Co. v. Sullivan, supra,* 376 U.S. 254, which concerned a newspaper advertisement seeking contributions for civil rights causes, the court cautioned, however, that presentation in advertising format does not necessarily establish that a message is commercial in character. (*Bolger, supra,* at p. 66 [103 S.Ct. at pp. 2879-2880].) Economic motivation likewise implies that the speech is intended to lead to commercial transactions, which in turn assumes that the speaker and the target audience are persons who will engage in those transactions, or their agents or intermediaries.

Finally, the factual content of the message should be commercial in character. In the context of regulation of false or misleading advertising, this typically means that the speech consists of representations of fact about the business operations, products, or services of the speaker (or the individual or company that the speaker represents), made for the purpose of promoting sales of, or other commercial transactions in, the speaker's products or services. This is consistent with, and implicit in, the United States Supreme Court's commercial speech decisions, each of which has involved statements about a product or service, or about the operations or qualifications of the person offering the product or service. (See, e.g., *Rubin v. Coors Brewing Co., supra,* 514 U.S. 476 [statement of alcohol content on beer bottle label]; *Ibanez v. Florida Dept. of Business and Professional Regulation, Bd. of Accountancy, supra,* 512 U.S. 136 [statements on an attorney's letterhead and business cards describing attorney's qualifications]; *Va. Pharmacy Bd. v. Va. Consumer Council, supra,* 425 U.S. 748 [advertisements showing prices of prescription drugs].)

This is also consistent with the third *Bolger* factor—product references. By "product references," we do not understand the United States Supreme Court to mean only statements about the price, qualities, or availability of individual items offered for sale. Rather, we understand "product references" to include also, for example, statements about the manner in which the products are manufactured, distributed, or sold, about repair or warranty services that the seller provides to purchasers of the product, or about the identity or qualifications of persons who manufacture, distribute, sell, service, or endorse the product. Similarly, references to services would include not only statements about the price, availability, and quality of the services themselves, but also, for example, statements about the education, experience, and qualifications of the persons providing or endorsing the services. (See, e.g., *Ibanez v. Florida Dept. of Business and Professional Regulation, Bd. of Accountancy, supra,* 512 U.S. 136 [statements on an attorney's letterhead and business cards describing attorney's training and qualifications].) This broad definition of "product references" is necessary, we think,

to adequately categorize statements made in the context of a modern, sophisticated public relations campaign intended to increase sales and profits by enhancing the image of a product or of its manufacturer or seller.

Our understanding of the content element of commercial speech is also consistent with the reasons that the United States Supreme Court has given for denying First Amendment protection to false or misleading commercial speech. The high court has stated that false or misleading commercial speech may be prohibited because the truth of commercial speech is "more easily verifiable by its disseminator" and because commercial speech, being motivated by the desire for economic profit, is less likely than noncommercial speech to be chilled by proper regulation. (*Va. Pharmacy Bd. v. Va. Consumer Council, supra,* 425 U.S. at p. 772, fn. 24 [96 S.Ct. at pp. 1830-1831].) This explanation assumes that commercial speech consists of factual statements and that those statements describe matters within the personal knowledge of the speaker or the person whom the speaker is representing and are made for the purpose of financial gain. Thus, this explanation implies that, at least in relation to regulations aimed at protecting consumers from false and misleading promotional practices, commercial speech must consist of factual representations about the business operations, products, or services of the speaker (or the individual or company on whose behalf the speaker is speaking), made for the purpose of promoting sales of, or other commercial transactions in, the speaker's products or services. The United States Supreme Court has never decided whether false statements about a product or service of a competitor of the speaker would properly be categorized as commercial speech. Because the issue is not presented here, we offer no view on how it should be resolved.

Apart from this consideration of the identities of the speaker and the audience, and the contents of the speech, we find nothing in the United States Supreme Court's commercial speech decisions that is essential to a determination that particular speech is commercial in character in the context of a consumer protection law intended to suppress false or deceptive commercial messages. Although in *Bolger, supra,* 463 U.S. 60, the United States Supreme Court noted that the speech at issue there was in a traditional advertising format, the court cautioned that it was not holding that this factor would always be necessary to the characterization of speech as commercial, and in *Leoni, supra,* 39 Cal.3d 609, this court held that an attorney's mailings were commercial speech even though they were not in the form of an advertisement. (See also *Ibanez v. Florida Dept. of Business and Professional Regulation, Bd. of Accountancy, supra,* 512 U.S. 136 [accepting as commercial speech statements on an attorney's letterhead and business cards].) Thus, advertising format is by no means essential to characterization as commercial speech.

■ Here, the first element—a commercial speaker—is satisfied because the speakers—Nike and its officers and directors—are engaged in commerce. Specifically, they manufacture, import, distribute, and sell consumer goods in the form of athletic shoes and apparel.

The second element—an intended commercial audience—is also satisfied. Nike's letters to university presidents and directors of athletic departments were addressed directly to actual and potential purchasers of Nike's products, because college and university athletic departments are major purchasers of athletic shoes and apparel. Plaintiff has alleged that Nike's press releases and letters to newspaper editors, although addressed to the public generally, were also intended to reach and influence actual and potential purchasers of Nike's products. Specifically, plaintiff has alleged that Nike made these statements about its labor policies and practices "to maintain and/or increase its sales and profits." To support this allegation, plaintiff has included as an exhibit a letter to a newspaper editor, written by Nike's director of communications, referring to Nike's labor policies practices and stating that "[c]onsumers are savvy and want to know they support companies with good products and practices" and that "[d]uring the shopping season, we encourage shoppers to remember that Nike is the industry's leader in improving factory conditions."

The third element—representations of fact of a commercial nature—is also present. In describing its own labor policies, and the practices and working conditions in factories where its products are made, Nike was making factual representations about its own business operations. In speaking to consumers about working conditions and labor practices in the factories where its products are made, Nike addressed matters within its own knowledge. The wages paid to the factories' employees, the hours they work, the way they are treated, and whether the environmental conditions under which they work violate local health and safety laws, are all matters likely to be within the personal knowledge of Nike executives, employees, or subcontractors. Thus, Nike was in a position to readily verify the truth of any factual assertions it made on these topics.

In speaking to consumers about working conditions in the factories where its products are made, Nike engaged in speech that is particularly hardy or durable. Because Nike's purpose in making these statements, at least as alleged in the first amended complaint, was to maintain its sales and profits, regulation aimed at preventing false and actually or inherently misleading speech is unlikely to deter Nike from speaking truthfully or at all about the conditions in its factories. To the extent that application of these laws may make Nike more cautious, and cause it to make greater efforts to verify the

truth of its statements, these laws will serve the purpose of commercial speech protection by "insuring that the stream of commercial information flow[s] cleanly as well as freely." (*Va. Pharmacy Bd. v. Va. Consumer Council, supra,* 425 U.S. at pp. 772 [96 S.Ct. at p. 1831].)

Finally, government regulation of Nike's speech about working conditions in factories where Nike products are made is consistent with traditional government authority to regulate commercial transactions for the protection of consumers by preventing false and misleading commercial practices. Trade regulation laws have traditionally sought to suppress and prevent not only false or misleading statements about products or services in themselves but also false or misleading statements about where a product was made (see § 17533.7 [making it unlawful to sell a product falsely labeled as "Made in U.S.A."]; 15 U.S.C. § 1125(a) [allowing damages for "false designation of origin"]), or by whom (see § 17520 et seq. [prohibiting false representation of product as made by blind workers]; § 17569 [prohibiting false representation of product "as made by authentic American Indian labor or workmanship"]; Lab. Code, § 1010 et seq. [prohibiting false labeling about the kind, character, or nature of labor employed in product's manufacture]).

Because in the statements at issue here Nike was acting as a commercial speaker, because its intended audience was primarily the buyers of its products, and because the statements consisted of factual representations about its own business operations, we conclude that the statements were commercial speech for purposes of applying state laws designed to prevent false advertising and other forms of commercial deception. Whether these statements could properly be categorized as commercial speech for some other purpose, and whether these statements could properly be categorized as commercial speech if one or more of these elements was not fully satisfied, are questions we need not decide here.

Nike argues that its allegedly false and misleading statements were not commercial speech because they were part of "an international media debate on issues of intense public interest." In a similar vein, our dissenting colleagues argue that the speech at issue here should not be categorized as commercial speech because, when Nike made the statements defending its labor practices, the nature and propriety of those practices had already become a matter of public interest and public debate. (Dis. opn. of Chin, J., *post,* at p. 974; dis. opn. of Brown, J., *post,* at pp. 980, 982-984.) This argument falsely assumes that speech cannot properly be categorized as commercial speech if it relates to a matter of significant public interest or controversy. As the United States Supreme Court has explained, commercial speech commonly concerns matters of intense public and private interest.

The individual consumer's interest in the price, availability, and characteristics of products and services "may be as keen, if not keener by far, than his interest in the day's most urgent political debate." (*Va. Pharmacy Bd. v. Va. Consumer Council, supra,* 425 U.S. at p. 763 [96 S.Ct. at p. 1826].) And for the public as whole, information on commercial matters is "indispensable" not only "to the proper allocation of resources in a free enterprise system" but also "to the formation of intelligent opinions as to how that system ought to be regulated or altered." (*Id.* at p. 765 [96 S.Ct. at p. 1827]; see also *Greater New Orleans Broadcasting Assn., Inc. v. United States, supra,* 527 U.S. at p. 184 [119 S.Ct. at p. 1930] [observing that the commercial speech at issue there concerned "an activity that is the subject of intense debate in many communities"].)

In her dissent, Justice Brown states that our logic "erroneously assumes that false or misleading commercial speech . . . can never be speech about a public issue." (Dis. opn. of Brown, J., *post,* at pp. 983-984.) On the contrary, we assume that commercial speech frequently and even normally addresses matters of public concern. The reason that it is "less necessary to tolerate inaccurate statements for fear of silencing the speaker" of commercial speech is not that such speech concerns matters of lesser public interest or value, but rather that commercial speech is both "more easily verifiable by its disseminator" and "less likely to be chilled by proper regulation." (*Va. Pharmacy Bd. v. Va. Consumer Council, supra,* 425 U.S. at p. 772, fn. 24 [96 S.Ct. at pp. 1830-1831; accord, *Lorillard Tobacco Co. v. Reilly, supra,* 533 U.S. at p. 576 [121 S.Ct. at p. 2433].)

In support of their argument that speech about issues of public importance or controversy must be considered noncommercial speech, our dissenting colleagues cite *Thomas v. Collins* (1945) 323 U.S. 516 [65 S.Ct. 315, 89 L.Ed. 430], and *Thornhill v. State of Alabama* (1940) 310 U.S. 88 [60 S.Ct. 736, 84 L.Ed. 1093]. The United States Supreme Court issued these decisions three decades before it developed the modern commercial speech doctrine in *Bigelow v. Virginia, supra,* 421 U.S. 809, and *Va. Pharmacy Bd. v. Va. Consumer Council, supra,* 425 U.S. 748. Moreover, neither decision addressed the validity of a law prohibiting false or misleading speech. To the extent they hold that truthful and nonmisleading speech about commercial matters of public importance is entitled to constitutional protection, they are consistent with the modern commercial speech doctrine and with the decision we reach today. We find nothing in either decision suggesting that the state lacks the authority to prohibit false and misleading factual representations, made for purposes of maintaining and increasing sales and profits, about the speaker's own products, services, or business operations.

For purposes of categorizing Nike's speech as commercial or noncommercial, it does not matter that Nike was responding to charges publicly raised

by others and was thereby participating in a public debate. The point is illustrated by a decision of a federal court of appeals about statements by a trade association denying there was scientific evidence that eating eggs increased the risk of heart and circulatory disease. (*National Commission on Egg Nutrition v. Federal Trade Commission* (7th Cir. 1977) 570 F.2d 157, 159, cert. den. (1978) 439 U.S. 821 [99 S.Ct. 86, 58 L.Ed.2d 113].) The court held that these statements were commercial speech subject to regulation by the Federal Trade Commission (FTC) to the extent the statements were false or misleading, even though the trade association made the statements "to counteract what the FTC described as 'anti-cholesterol attacks on eggs which had resulted in steadily declining per capita egg consumption.'" (*Id.* at p. 159.) Responding to the argument that the statements were noncommercial because they concerned a debate on a matter of great public interest, the federal court of appeals responded that "the right of government to restrain false advertising can hardly depend upon the view of an agency or court as to the relative importance of the issue to which the false advertising relates." (*Id.* at p. 163.)

Here, Nike's speech is not removed from the category of commercial speech because it is intermingled with noncommercial speech. To the extent Nike's press releases and letters discuss policy questions such as the degree to which domestic companies should be responsible for working conditions in factories located in other countries, or what standards domestic companies ought to observe in such factories, or the merits and effects of economic "globalization" generally, Nike's statements are noncommercial speech. Any content-based regulation of these noncommercial messages would be subject to the strict scrutiny test for fully protected speech. (See, e.g., *Consolidated Edison Co. v. Public Serv. Comm'n, supra,* 447 U.S. 530.) But Nike may not "immunize false or misleading product information from government regulation simply by including references to public issues." (*Bolger, supra,* 463 U.S. at p. 68 [103 S.Ct. at p. 2881], fn. omitted.) Here, the alleged false and misleading statements all relate to the commercial portions of the speech in question—the description of actual conditions and practices in factories that produce Nike's products—and thus the proposed regulations reach only that commercial portion.

Asserting that the commercial and noncommercial elements in Nike's statement were "inextricably intertwined," our dissenting colleagues maintain that it must therefore be categorized as noncommercial speech, and they cite in support the United States Supreme Court's decision in *Riley v. National Federation of Blind* (1988) 487 U.S. 781 [108 S.Ct. 2667, 101 L.Ed.2d 669] (*Riley*). That decision concerned regulation of charitable solicitations, a category of speech that does not fit within our limited-purpose

definition of commercial speech because it does not involve factual representations about a product or service that is offered for sale. More importantly, the high court has since explained that in *Riley* "the commercial speech (if it was that) was 'inextricably intertwined' because the state law required it to be included" and that commercial and noncommercial messages are not "inextricable" unless there is some legal or practical compulsion to combine them. (*Board of Trustees, State Univ. of N.Y. v. Fox, supra*, 492 U.S. at p. 474 [109 S.Ct. at p. 3031], italics omitted.) No law required Nike to combine factual representations about its own labor practices with expressions of opinion about economic globalization, nor was it impossible for Nike to address those subjects separately.

We also reject Nike's argument that regulating its speech to suppress false and misleading statements is impermissible because it would restrict or disfavor expression of one point of view (Nike's) and not the other point of view (that of the critics of Nike's labor practices). The argument is misdirected because the regulations in question do not suppress points of view but instead suppress false and misleading statements of fact. As we have explained, to the extent Nike's speech represents expression of opinion or points of view on general policy questions such as the value of economic "globalization," it is noncommercial speech subject to full First Amendment protection. Nike's speech loses that full measure of protection only when it concerns facts material to commercial transactions—here, factual statements about how Nike makes its products.

Moreover, differential treatment of speech about products and services based on the identity of the speaker is inherent in the commercial speech doctrine as articulated by the United States Supreme Court. A noncommercial speaker's statements criticizing a product are generally noncommercial speech, for which damages may be awarded only upon proof of both falsehood and actual malice. (See, e.g., *Bose Corp. v. Consumers Union of U.S., Inc., supra*, 466 U.S. at p. 513 [104 S.Ct. at pp. 1966-1967] [so treating unflattering statements in a consumer magazine's review of high fidelity speakers].) A commercial speaker's statements in praise or support of the same product, by comparison, are commercial speech that may be prohibited entirely to the extent the statements are either false or actually or inherently misleading. (*In re R.M.J., supra*, 455 U.S. at p. 203 [102 S.Ct. at pp. 937-938].) To repeat, the justification for this different treatment, as the high court has explained, is that when a speaker promotes its own products, it is "less necessary to tolerate inaccurate statements for fear of silencing the speaker" because the described speech is both "more easily verifiable by its disseminator" and "less likely to be chilled by proper regulation." (*Va. Pharmacy Bd. v. Va. Consumer Council, supra*, 425 U.S. at p. 772, fn. 24 [96

S.Ct. at pp. 1830-1831]; accord, *Lorillard Tobacco Co. v. Reilly, supra,* 533 U.S. at p. 576 [121 S.Ct. at p. 2433].)

Our dissenting colleagues are correct that the identity of the speaker is usually not a proper consideration in regulating speech that is entitled to First Amendment protection, and that a valid regulation of protected speech may not handicap one side of a public debate. But to decide whether a law regulating speech violates the First Amendment, the very first question is whether the speech that the law regulates is entitled to First Amendment protection at all. As we have seen, commercial speech that is false or misleading receives no protection under the First Amendment, and therefore a law that prohibits only such unprotected speech cannot violate constitutional free speech provisions.

We conclude, accordingly, that here the trial court and the Court of Appeal erred in characterizing as noncommercial speech, under the First Amendment to the federal Constitution, Nike's allegedly false and misleading statements about labor practices and working conditions in factories where Nike products are made.

We now disapprove as ill-considered dicta two statements of this court in *Spiritual Psychic Science Church v. City of Azusa* (1985) 39 Cal.3d 501 [217 Cal.Rptr. 225, 703 P.2d 1119]. There we remarked that commercial speech is speech "which has but one purpose—to advance an economic transaction," and we suggested that "an advertisement informing the public that the cherries for sale at store X were picked by union workers" would be noncommercial speech. (*Id.* at p. 511.)

As we have explained, the United States Supreme Court has indicated that economic motivation is relevant but not conclusive and perhaps not even necessary. (*Bolger, supra,* 463 U.S. at p. 67 & fn. 14 [103 S.Ct. at pp. 2880-2881].) The high court has never held that commercial speech must have as its *only* purpose the advancement of an economic transaction, and it has explained instead that commercial speech may be intermingled with noncommercial speech. (*Id.* at pp. 67-68 [103 S.Ct. at pp. 2880-2881].) An advertisement primarily intended to reach consumers and to influence them to buy the speaker's products is not exempt from the category of commercial speech because the speaker also has a secondary purpose to influence lenders, investors, or lawmakers.

Nor is speech exempt from the category of commercial speech because it relates to the speaker's labor practices rather than to the price, availability, or quality of the speaker's goods. An advertisement to the public that

cherries were picked by union workers is commercial speech if the speaker has a financial or commercial interest in the sale of the cherries and if the information that the cherries had been picked by union workers is likely to influence consumers to buy the speaker's cherries. Speech is commercial in its content if it is likely to influence consumers in their commercial decisions. For a significant segment of the buying public, labor practices do matter in making consumer choices.

B. *The California Constitution*

In the few cases in which this court has addressed the distinction between commercial and noncommercial speech, we have not articulated a separate test for determining what constitutes commercial speech under the state Constitution, but instead we have used the tests fashioned by the United States Supreme Court. For example, in *Leoni, supra,* 39 Cal.3d 609, we used the three-factor test the high court had articulated in *Bolger, supra,* 463 U.S. 60, and we concluded that the speech in question was commercial speech because two of the three factors were present. So also here, we perceive no need to articulate a separate test for commercial speech under the state Constitution. Having concluded that the speech at issue is commercial speech under the federal Constitution, we now reach the same conclusion under the California Constitution.

## V. Conclusion

As the United States Supreme Court has explained, false and misleading speech has no constitutional value in itself and is protected only in circumstances and to the extent necessary to give breathing room for the free debate of public issues. Commercial speech, because it is both more readily verifiable by its speaker and more hardy than noncommercial speech, can be effectively regulated to suppress false and actually or inherently misleading messages without undue risk of chilling public debate. With these basic principles in mind, we conclude that when a corporation, to maintain and increase its sales and profits, makes public statements defending labor practices and working conditions at factories where its products are made, those public statements are commercial speech that may be regulated to prevent consumer deception.

Sprinkled with references to a series of children's books about wizardry and sorcery, Justice Brown's dissent itself tries to find the magic formula or incantation that will transform a business enterprise's factual representations in defense of its own products and profits into noncommercial speech exempt from our state's consumer protection laws. As we have explained,

however, such representations, when aimed at potential buyers for the purpose of maintaining sales and profits, may be regulated to eliminate false and misleading statements because they are readily verifiable by the speaker and because regulation is unlikely to deter truthful and nonmisleading speech.

In concluding, contrary to the Court of Appeal, that Nike's speech at issue here is commercial speech, we do not decide whether that speech was, as plaintiff has alleged, false or misleading, nor do we decide whether plaintiff's complaint is vulnerable to demurrer for reasons not considered here. Because the demurrers of Nike and the individual defendants were based on multiple grounds, further proceedings on the demurrers may be required in the Court of Appeal, the superior court, or both. Our decision on the narrow issue before us on review does not foreclose those proceedings.

The judgment of the Court of Appeal is reversed, and the matter is remanded to that court for further proceedings consistent with this opinion.

George, C. J., Werdegar, J., and Moreno, J., concurred.

**CHIN, J.**—I respectfully dissent.

Nike, Inc. (Nike), is a major international corporation with a multibillion-dollar enterprise. The nature of its labor practices has become a subject of considerable public interest and scrutiny. Various persons and organizations have accused Nike of engaging in despicable practices, which they have described sometimes with such caustic and scathing words as "slavery" and "sweatshop." Nike's critics and these accusations receive full First Amendment protection. And well they should. "The First and Fourteenth Amendments embody our 'profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open . . . .' " (*Garrison v. Louisiana* (1964) 379 U.S. 64, 75 [85 S.Ct. 209, 216, 13 L.Ed.2d 125] (*Garrison*), quoting *New York Times Co. v. Sullivan* (1964) 376 U.S. 254, 270 [84 S.Ct. 710, 721, 11 L.Ed.2d 686, 95 A.L.R.2d 1412].) "Under the First Amendment there is no such thing as a false idea. However pernicious an opinion may seem, we depend for its correction not on the conscience of judges and juries but on the competition of other ideas." (*Gertz v. Robert Welch, Inc.* (1974) 418 U.S. 323, 339-340 [94 S.Ct. 2997, 3007, 41 L.Ed.2d 789], fn. omitted.)

While Nike's critics have taken full advantage of their right to " 'uninhibited, robust, and wide-open' " debate (*Garrison, supra*, 379 U.S. at p. 75 [85 S.Ct. at p. 216]), the same cannot be said of Nike, the object of their ire.

When Nike tries to defend itself from these attacks, the majority denies it the same First Amendment protection Nike's critics enjoy. Why is this, according to the majority? Because Nike competes not only in the marketplace of ideas, but also in the marketplace of manufactured goods. And because Nike sells shoes—and its defense against critics may help sell those shoes—the majority asserts that Nike may not freely engage in the debate, but must run the risk of lawsuits under California's unfair competition law (Bus. & Prof. Code, § 17200 et seq.) and false advertising law (Bus. & Prof. Code, § 17500 et seq.), should it ever make a factual claim that turns out to be inaccurate. According to the majority, if Nike utters a factual misstatement, unlike its critics, it may be sued for restitution, civil penalties, and injunctive relief under these sweeping statutes. (Maj. opn., *ante*, at pp. 949-951.)

Handicapping one side in this important worldwide debate is both ill considered and unconstitutional. Full free speech protection for one side and strict liability for the other will hardly promote vigorous and meaningful debate. "Debate on public issues will not be uninhibited if the speaker must run the risk that it will be proved in court that he spoke out of hatred; even if he did speak out of hatred, utterances honestly believed contribute to the free interchange of ideas and the ascertainment of truth." (*Garrison, supra*, 379 U.S. at p. 73 [85 S.Ct. at p. 215].) The state, "even with the purest of motives, may not substitute its judgment as to how best to speak for that of speakers and listeners; free and robust debate cannot thrive if directed by the government." (*Riley v. National Federation of Blind* (1988) 487 U.S. 781, 791 [108 S.Ct. 2667, 2675, 101 L.Ed.2d 669] (*Riley*).)

In its pursuit to regulate Nike's speech—in hope of prohibiting false and misleading statements—the majority has unduly trammeled basic constitutional freedoms that form the foundation of this free government.[1] "[W]here . . . suppression of speech suggests an attempt to give one side of a debatable public question an advantage in expressing its views to the people, the First Amendment is plainly offended." (*First National Bank of Boston v. Bellotti* (1978) 435 U.S. 765, 785-786 [98 S.Ct. 1407, 1420-1421, 55 L.Ed.2d 707], fn. omitted (*Bellotti*).)

## I. IRRESPECTIVE OF NIKE'S ECONOMIC MOTIVATION, THE PUBLIC HAS A RIGHT TO RECEIVE INFORMATION ON MATTERS OF PUBLIC CONCERN

The United States Supreme Court has emphasized that economic motivation—in this case, Nike's desire to sell athletic products—is not a dispositive

---

[1] I take no sides in this public debate. Who is right and who is wrong is not for me, or the majority, to decide. It is for the public—fully informed as the First Amendment guarantees—to judge. (*Gertz v. Robert Welch, Inc., supra*, 418 U.S. at pp. 339-340 [94 S.Ct. at pp. 3006-3007].)

factor in determining whether certain speech is commercial. (*Bolger v. Youngs Drug Products Corp.* (1983) 463 U.S. 60, 67 [103 S.Ct. 2875, 2880-2881, 77 L.Ed.2d 469] (*Bolger*).) In deciding the scope of the constitutional protection of corporate speech, the high court struck down a Massachusetts criminal statute that proscribed corporations from giving campaign contributions to influence the vote on a referendum materially affecting the corporation's property, business, or assets. (*Bellotti, supra,* 435 U.S. 765.) Corporate speech, the high court noted, did not deserve less protection simply because of its source. "The question in this case, simply put, is whether the corporate identity of the speaker deprives this proposed speech of what otherwise would be its clear entitlement to protection." (*Id.* at p. 778 [98 S.Ct. at p. 1416].) In Nike's case, based on the majority's holding, it does.

As the Court of Appeal below noted, given Nike's powerful corporate image and industry stronghold, the private company "exemplifi[ed] the perceived evils or benefits of labor practices associated with the processes of economic globalization." Nike, in effect, became the "poster child" in the international campaign for labor rights and reform (see, e.g., Note, *Now Playing: Corporate Codes of Conduct in the Global Theater: Is Nike Just Doing It?* (1998) 15 Ariz. J. Intl. & Comp. L. 905), and Nike's labor practices became relevant in a much broader, and public, context. Though expressions on labor disputes have been afforded full First Amendment protection (see *Va. Pharmacy Bd. v. Va. Consumer Council* (1976) 425 U.S. 748, 762 [96 S.Ct. 1817, 1825-1826, 48 L.Ed.2d 346] (*Va. Pharmacy Bd.*), and cases cited; *Thornhill v. Alabama* (1940) 310 U.S. 88, 101-103 [60 S.Ct. 736, 743-745, 84 L.Ed. 1093] (*Thornhill*)), the majority loses sight of the full protections afforded this speech in the face of Nike's corporate identity. (*Bellotti, supra,* 435 U.S. at p. 778 [98 S.Ct. at p. 1416].) And because of this myopia, the public loses.

The public at large, in addition to Nike's actual and intended customers, has the right to receive information from both sides of this international debate. "Freedom of speech presupposes a willing speaker. But where a speaker exists . . . the protection afforded is to the communication, to its source and to its recipients both." (*Va. Pharmacy Bd., supra,* 425 U.S. at p. 756 [96 S.Ct. at p. 1823], fn. omitted.) The First Amendment serves an "informational purpose" that guarantees "the public access to discussion, debate, and the dissemination of information and ideas." (*Bellotti, supra,* 435 U.S. at p. 782, fn. 18 [98 S.Ct. at p. 1419]; *id.* at p. 783 [98 S.Ct. at p. 1419]; see *Bigelow v. Virginia* (1975) 421 U.S. 809, 822 [95 S.Ct. 2222, 2232-2235, 44 L.Ed.2d 600] (*Bigelow*).) Thus, not only Nike, but all of us, are the poorer for the majority's assault on free speech.

In striking down Virginia's attempt to ban a newspaper advertisement announcing the availability of legal New York abortions, the high court noted: "The advertisement . . . did more than simply propose a commercial transaction. It contained factual material of clear 'public interest.' Portions of its message . . . involve the exercise of the freedom of communicating information and disseminating opinion. [¶] Viewed in its entirety, the advertisement conveyed information of potential interest and value to a diverse audience—*not only to readers possibly in need of the services offered, but also to those with a general curiosity about, or genuine interest in, the subject matter or the law of another State and its development, and to readers seeking reform in Virginia.* . . . Thus, in this case, appellant's First Amendment interests coincided with the constitutional interests of the general public." (*Bigelow, supra*, 421 U.S. at p. 822 [95 S.Ct. at pp. 2232-2233], fn. omitted, italics added; *Jacoby v. State Bar* (1977) 19 Cal.3d 359, 370-371 [138 Cal.Rptr. 77, 562 P.2d 1326, 4 A.L.R.4th 273] [following *Bigelow*]; cf. *Bolger, supra*, 463 U.S. at p. 68 [103 S.Ct. at p. 2881] [company may not "immunize false or misleading product information from government regulation simply by including references to public issues"].)

Here, Nike's statements regarding its labor practices in China, Vietnam, and Indonesia provided vital information on the very public controversy concerning using low-cost foreign labor to manufacture goods sold in America. Nike's responses defended against adverse reports that its overseas manufacturers committed widespread labor, health, and safety law violations. Far from promoting the sale of its athletic products, Nike did not include this information through product labels, inserts, packaging, or commercial advertising intended to reach only Nike's actual or potential customers. Rather, Nike responded to the negative publicity through press releases, letters to newspapers, and letters to university presidents and athletic directors. (Cf. *Bolger, supra*, 463 U.S. 60 [contraceptive manufacturer's informational pamphlets included with advertisements deemed commercial speech].) To the extent Nike may have been financially motivated to defend its business and livelihood against these attacks, this motivation is not dispositive in identifying speech as commercial. (*Bolger, supra*, 463 U.S. at p. 67 [103 S.Ct. at pp. 2880-2881].) "Viewed in its entirety, [Nike's speech] conveyed information of potential interest and value to a diverse audience . . . ." (*Bigelow, supra*, 421 U.S. at p. 822 [95 S.Ct. at p. 2232].)

II. Nike's Speech Is Not Traditional Commercial Speech

Indeed, characterizing Nike's speech here as commercial speech is inconsistent with the high court's constitutional jurisprudence for yet another

reason.[2] The high court has stated that traditional commercial speech is speech that "does 'no more than propose a commercial transaction.' " (*Va. Pharmacy Bd.*, *supra*, 425 U.S. at p. 762 [96 S.Ct. at p. 1825]; *Bolger*, *supra*, 463 U.S. at p. 66 [103 S.Ct. at pp. 2879-2880]; see also *Board of Trustees, State Univ. of N. Y. v. Fox* (1989) 492 U.S. 469, 473 [109 S.Ct. 3028, 3030-3031, 106 L.Ed.2d 388]; *Zauderer v. Office of Disciplinary Counsel* (1985) 471 U.S. 626, 637 [105 S.Ct. 2265, 2274, 85 L.Ed.2d 652]; but see *Central Hudson Gas & Elec. v. Public Serv. Comm'n, supra*, 447 U.S. at p. 561 [100 S.Ct. at pp. 2348-2349] [commercial speech is "expression related solely to the economic interests of the speaker and its audience"].) In this case, Nike's speech here went beyond proposing a commercial transaction. It provided information vital to the public debate on international labor rights and reform. As the Court of Appeal below observed, "[i]nformation about the labor practices at Nike's overseas plants . . . constitute[d] data relevant to a controversy of great public interest in our times."

Contrary to the majority's assertions (see maj. opn., *ante*, at p. 966), the high court's restriction—"advertising which 'links a product to a current public debate' is not thereby entitled to the constitutional protection afforded noncommercial speech" (*Bolger*, *supra*, 463 U.S. at p. 68 [103 S.Ct. at p. 2881])—does not apply here. In *Bolger*, the informational mailings, though containing issues of public concern such as venereal disease and family planning, were at bottom commercial speech directed at selling contraceptives. (*Id.* at p. 66 [103 S.Ct. at pp. 2879-2880].) The court made clear that most of the mailings fell "within the core notion of commercial speech— 'speech which does "no more than propose a commercial transaction." ' " (*Ibid.*) To the extent that some mailings discussed public concerns, the high court cautioned that "[a]dvertisers should not be permitted to immunize false or misleading product information from government regulation simply by including references to public issues." (*Id.* at p. 68 [103 S.Ct. at p. 2881].)

In a case decided before *Bolger*, the high court held that a utility company's monthly electric bill inserts advocating the use of nuclear power could

---

[2]While the majority correctly observes that in this constitutional analysis, "the very first question is whether the speech that the law regulates is entitled to First Amendment protection at all" (maj. opn., *ante*, at p. 968), it conflates this question with the issue whether commercial speech may be regulated, the latter a foregone conclusion. (*Bolger*, *supra*, 463 U.S. at p. 65 [103 S.Ct. at p. 2879].) Advocating what it calls a "limited-purpose" definition of commercial speech (maj. opn., *ante*, at pp. 960, 966-967), the majority proposes that a company's factual statements about its products or services are commercial and subject to regulation if these statements are "false or misleading." (*Id.* at p. 968.) In other words, the majority concludes "a law that prohibits only such unprotected speech cannot violate constitutional free speech provisions." (*Ibid.*) Whether a company's statements are allegedly false or misleading *does not determine the threshold question at issue in this case*—whether the speech is commercial or noncommercial. (See *Central Hudson Gas & Elec. v. Public Serv. Comm'n* (1980) 447 U.S. 557, 566 [100 S.Ct. 2343, 2351, 65 L.Ed.2d 341].)

not be regulated under the First and Fourteenth Amendments. (*Consolidated Edison Co. v. Public Serv. Comm'n* (1980) 447 U.S. 530 [100 S.Ct. 2326, 65 L.Ed.2d 319] (*Consolidated Edison*).) In *Consolidated Edison*, the high court did not address whether the inserts constituted commercial speech. Rather, it concluded that the utility commission's regulation banning the inserts "limited the means by which Consolidated Edison may participate in the public debate on this question and other controversial issues of national interest and importance. Thus, the Commission's prohibition of discussion of controversial issues strikes at the heart of the freedom to speak." (*Id.* at p. 535 [100 S.Ct. at p. 2332].) Despite Consolidated Edison's obvious economic incentive in promoting the use of nuclear power, the high court did not consider, much less determine, whether the inserts placed in electric bills amounted to commercial speech.

The high court's concern in *Bolger*, *supra*, 463 U.S. 60, therefore, was that advertisers refrain from inserting information on public issues *as a pretext* to avoid regulations governing their commercial speech.[3] That is simply not the case here. Nike's speech—in the form of press releases and letters defending against accusations about its overseas labor practices—was not in any sense pretextual, but prompted and necessitated by public criticism. As noted, Nike did not use product labels, packaging, advertising, or other media intended to directly reach its actual or potential customers. Nike's speech did not "simply . . . include[] references to public issues." (*Bolger*, *supra*, 463 U.S. at p. 68 [103 S.Ct. at p. 2881].) Nike's labor practices and policies, and in turn, its products, *were* the public issue. Its "discussion of controversial issues strikes at the heart of the freedom to speak." (*Consolidated Edison*, *supra*, 447 U.S. at p. 535 [100 S.Ct. at p. 2332].)

At the very least, this case typifies the circumstance where commercial speech and noncommercial speech are "inextricably intertwined." (*Riley*, *supra*, 487 U.S. at p. 796 [108 S.Ct. at p. 2677].) In *Riley*, the high court held that a North Carolina statute regulating solicitation of charitable contributions affected protected speech and was not narrowly tailored to meet the state's interest in protecting charities from fraud. (*Id.* at p. 789 [108 S.Ct. at pp. 2673-2674].) As relevant here, the court observed that even if a professional fundraiser's speech amounted to commercial speech, "we do not

---

[3]The phrase " 'does "no more than propose a commercial transaction" ' " (*Bolger*, *supra*, 463 U.S. at p. 66 [103 S.Ct. at p. 2880]) "must be understood to reflect judgments about 'the character of the expressive activity' at issue judgments that necessarily entail an assessment of the nature and constitutional significance of the larger social practice within which that activity is embedded. That is why commercial speech cannot be transformed into public discourse merely by altering its content to insert assertions about matters of public concern." (Post, *The Constitutional Status of Commercial Speech* (2000) 48 UCLA L.Rev. 1, 18-19, fns. omitted.)

believe that the speech retains its commercial character when it is inextricably intertwined with otherwise fully protected speech." (*Id.* at p. 796 [108 S.Ct. at p. 2677].) It further held that "where, as here, the component parts of a single speech are inextricably intertwined, we cannot parcel out the speech, applying one test to one phrase and another test to another phrase. Such an endeavor would be both artificial and impractical. Therefore, we apply our test for fully protected expression." (*Ibid.*)

Notwithstanding the fact that *Riley* dealt with charitable solicitations, which are not involved in this case, the high court relied, in part, on a case that provides insight here. (*Riley, supra,* 487 U.S. at p. 796 [108 S.Ct. at p. 2677], citing *Thomas v. Collins* (1945) 323 U.S. 516, 540-541 [65 S.Ct. 315, 327-328, 89 L.Ed. 430] (*Thomas*).) In *Thomas,* which did not deal with solicitation of property or funds, the high court addressed the issue whether a union organizer's speech soliciting members was protected by the First Amendment, and whether a registration requirement in order to speak was constitutionally impermissible. (*Thomas, supra,* 323 U.S. at pp. 533-534 [65 S.Ct. at pp. 324-325].) Answering *yes* to both questions, the high court cautioned that a state's regulation, "whether aimed at fraud or other abuses, must not trespass upon the domain set apart for free speech and free assembly. This Court has recognized that 'in the circumstances of our times the dissemination of information concerning the facts of a labor dispute must be regarded as within that area of free discussion that is guaranteed by the Constitution. . . . Free discussion concerning the conditions in industry and the causes of labor disputes appears to us indispensable to the effective and intelligent use of the processes of popular government to shape the destiny of modern industrial society.' " (*Id.* at p. 532 [65 S.Ct. at p. 323], quoting *Thornhill, supra,* 310 U.S. at pp. 102, 103 [60 S.Ct. at pp. 744-745].)[4]

This case resembles *Thomas* in that Nike's speech provided information " 'concerning the conditions in [the manufacturing] industry' " and thereby used " 'the processes of popular government to shape the destiny of modern industrial society.' [Citation.]" (*Thomas, supra,* 323 U.S. at p. 532 [65 S.Ct. at p. 323], quoting *Thornhill, supra,* 310 U.S. at p. 102 [60 S.Ct. at p. 744].) Nike, which came to the forefront of the international labor abuse debate, provided relevant information about its labor practices in its overseas plants.

---

[4]Contrary to the majority's suggestion (maj. opn., *ante,* at p. 965), the fact that the high court decided both *Thornhill, supra,* 310 U.S. 88, and *Thomas, supra,* 323 U.S. 516, before its seminal cases on commercial speech, does not make these earlier cases' affirmation of fundamental principles on First Amendment protection less pertinent. Indeed, the high court relied, in part, on *Thornhill, supra,* 310 U.S. at page 102 [60 S.Ct. at page 744], in *Va. Pharmacy Bd., supra,* 425 U.S. at page 762 [96 S.Ct. at page 1826], to conclude that "[t]he interests of the contestants in a labor dispute are primarily economic, but it has long been settled that both the employee and the employer are protected by the First Amendment when they express themselves on the merits of the dispute in order to influence its outcome."

Nike's speech, in an attempt to influence public opinion on economic globalization and international labor rights and working conditions, gave the public insight and perspective into the debate. This speech should be fully protected as "essential to free government." (*Thornhill, supra,* 310 U.S. at p. 95 [60 S.Ct. at p. 741].)

The majority's attempt to parse out Nike's noncommercial speech—"*to the extent* Nike's speech represents expression of opinion or points of view on general policy questions . . . it is noncommercial speech" (maj. opn., *ante,* at p. 967, italics added)—is both unavailing and unhelpful. Even assuming that Nike's factual statements regarding how its products are made constitute commercial speech, that speech is "inextricably intertwined" with its noncommercial speech. (*Riley, supra,* 487 U.S. at p. 796 [108 S.Ct. at p. 2677].) Contrary to the majority's suggestion (maj. opn., *ante,* at pp. 966-967), Nike realistically could not discuss its general policy on employee rights and working conditions and its views on economic globalization *without* reference to the labor practices of its overseas manufacturers, Nike products, and how they are made. Attempting to parse out the commercial speech from the noncommercial speech in this context "would be both artificial and impractical." (*Riley, supra,* 487 U.S. at p. 796 [108 S.Ct. at p. 2677].)

### III. CONCLUSION

The majority today refuses to honor a fundamental commitment and guarantee that both sides in a public debate may compete vigorously—and equally—in the marketplace of ideas. The First Amendment ensures the freedom to speak on matters of public interest by *both* sides, not just one judicially favored. (*Bellotti, supra,* 435 U.S. at pp. 785-786 [98 S.Ct. at pp. 1420-1421].) Sadly, Nike is not the only one who loses here—the public does, too. "Those who won our independence had confidence in the power of free and fearless reasoning and communication of ideas to discover and spread political and economic truth. Noxious doctrines in those fields may be refuted and their evil averted by the courageous exercise of the right of free discussion." (*Thornhill, supra,* 310 U.S. at p. 95 [60 S.Ct. at p. 741].)

Because I would give *both* sides in this important public controversy the full protection that our Constitution guarantees, I respectfully dissent.

Baxter, J., concurred.

**BROWN, J.**—I respectfully dissent.

### I

In 1942, the United States Supreme Court, like a wizard trained at Hogwarts, waved its wand and "plucked the commercial doctrine out of thin

air." (Kozinski & Banner, *Who's Afraid of Commercial Speech* (1990) 76 Va. L.Rev. 627, 627.) Unfortunately, the court's doctrinal wizardry has created considerable confusion over the past 60 years as it has struggled to define the difference between commercial and noncommercial speech. The United States Supreme Court has, in recent years, acknowledged "the difficulty of drawing bright lines that will clearly cabin commercial speech in a distinct category." (*City of Cincinnati v. Discovery Network, Inc.* (1993) 507 U.S. 410, 419 [113 S.Ct. 1505, 1511, 123 L.Ed.2d 99] (*Discovery Network*).) After tracing the various definitions of commercial speech used over the years, the court conceded that no "categorical definition of the difference between" commercial and noncommercial speech exists. (*Id.* at pp. 420-423 [113 S.Ct. at pp. 1511-1513].) Instead, the difference is a matter of " 'common[]sense' " (*Ohralik v. Ohio State Bar Assn.* (1978) 436 U.S. 447, 455-456 [98 S.Ct. 1912, 1918-1919, 56 L.Ed.2d 444] (*Ohralik*)), and restrictions on speech "must be examined carefully to ensure that speech deserving of greater constitutional protection is not inadvertently suppressed." (*Bolger v. Youngs Drug Products Corp.* (1983) 463 U.S. 60, 66 [103 S.Ct. 2875, 2879-2880, 77 L.Ed.2d 469], fn. omitted (*Bolger*).) Consistent with these pronouncements, the United States Supreme Court has expressly refused to define the elements of commercial speech. (See *id.* at p. 67, fn. 14 [103 S.Ct. at pp. 2880-2881].) Indeed, "the impossibility of specifying the parameters that define the category of commercial speech has haunted its jurisprudence and scholarship." (Post, *The Constitutional Status of Commercial Speech* (2000) 48 UCLA L.Rev. 1, 7.)

Despite this chaos, the majority, ostensibly guided by *Bolger*, has apparently divined a new and simpler test for commercial speech. Under this "limited-purpose test," "categorizing a particular statement as commercial or noncommercial speech requires consideration of three elements: the speaker, the intended audience, and the content of the message." (Maj. opn., *ante*, at p. 960.) Unfortunately, the majority has forgotten the teachings of H.L. Mencken: "every human problem" has a "solution" that is "neat, plausible, and wrong." (Mencken, Prejudices: Second Series (1977 reprint) p. 148.) Like the purported discovery of cold fusion over a decade ago, the majority's test for commercial speech promises much, but solves nothing. Instead of clarifying the commercial speech doctrine, the test violates fundamental principles of First Amendment jurisprudence by making the level of protection given speech dependent on the identity of the speaker—and not just the speech's content—and by stifling the ability of certain speakers to participate in the public debate. In doing so, the majority unconstitutionally favors some speakers over others and conflicts with the decisions of other courts.

Contrary to the majority's belief, our current First Amendment jurisprudence defies any simple solution. Under the commercial speech doctrine

currently propounded by the United States Supreme Court, all speech is *either* commercial or noncommercial, and commercial speech receives less protection than noncommercial speech. (*Central Hudson Gas & Elec. Corp. v. Public Serv. Comm'n* (1980) 447 U.S. 557, 562-563 [100 S.Ct. 2343, 2349-2350, 65 L.Ed.2d 341] (*Central Hudson*).) The doctrine further assumes that all commercial speech is the *same* under the First Amendment. Thus, all commercial speech receives the *same* level of lesser protection. The state may therefore ban *all* commercial speech "that is fraudulent or deceptive without further justification" (*Edenfield v. Fane* (1993) 507 U.S. 761, 768 [113 S.Ct. 1792, 1798-1799, 123 L.Ed.2d 543]), but may not do the same to fraudulent or deceptive speech in " 'matters of public concern' " (*Dun & Bradstreet, Inc. v. Greenmoss Builders* (1985) 472 U.S. 749, 758-759 [105 S.Ct. 2939, 2944-2945, 86 L.Ed.2d 593] (plur. opn. of Powell, J.) (*Dun & Bradstreet*), quoting *First National Bank of Boston v. Bellotti* (1978) 435 U.S. 765, 776 [98 S.Ct. 1407, 1415-1416, 55 L.Ed.2d 707] (*Bellotti*)).

This simple categorization presupposes that commercial speech is wholly distinct from noncommercial speech and that all commercial speech has the same value under the First Amendment. The reality, however, is quite different. With the growth of commercialism, the politicization of commercial interests, and the increasing sophistication of commercial advertising over the past century, the gap between commercial and noncommercial speech is rapidly shrinking. As several commentators have observed, examples of the intersection between commercial speech and various forms of noncommercial speech, including scientific, political and religious speech, abound. (See, e.g., Kozinski & Banner, *Who's Afraid of Commercial Speech*, *supra*, 76 Va. L.Rev. at pp. 639-648; Redish, *Product Health Claims and the First Amendment: Scientific Expression and the Twilight Zone of Commercial Speech* (1990) 43 Vand. L.Rev. 1433, 1449-1454.) Indeed, the recent commissioning of a Fay Weldon novel by the jewelry company Bulgari as a marketing ploy highlights this blurring of commercial and noncommercial speech. (See Arnold, *Making Books: Placed Products, and Their Cost*, N.Y. Times (Sept. 13, 2001) p. E3, col. 1.)

Although the world has become increasingly commercial, the dichotomous nature of the commercial speech doctrine remains unchanged. The classification of speech as commercial or noncommercial determines the level of protection accorded to that speech under the First Amendment. Thus, the majority correctly characterizes the issue as "whether defendant corporation's false statements are commercial or noncommercial speech for purposes of constitutional free speech analysis under the state and federal Constitutions." (Maj. opn., *ante*, at p. 946.) If Nike's press releases, letters

and other documents are commercial speech, then the application of Business and Professions Code sections 17204 and 17535[1]—which establish strict liability for false and misleading ads—is constitutional. Otherwise, it is not.

Constrained by this rigid dichotomy, I dissent because Nike's statements are more like noncommercial speech than commercial speech. Nike's commercial statements about its labor practices cannot be separated from its noncommercial statements about a public issue, because its labor practices *are* the public issue. Indeed, under the circumstances presented in this case, Nike could hardly engage in a general discussion on overseas labor exploitation and economic globalization without discussing its own labor practices. (See *Thomas v. Collins* (1945) 323 U.S. 516, 534-535 [65 S.Ct. 315, 324-325, 89 L.Ed. 430].) Thus, the commercial elements of Nike's statements are "inextricably intertwined" with their noncommercial elements. (*Riley v. National Federation of Blind* (1988) 487 U.S. 781, 796 [108 S.Ct. 2667, 2677, 101 L.Ed.2d 669] (*Riley*).) This court should therefore "apply [the] test for fully protected expression" (*ibid.*) notwithstanding the majority's specious distinctions of the relevant case law. Under this test, a categorical ban on all false and misleading statements made by Nike about its labor practices violates the First Amendment.

Although this result follows from controlling United States Supreme Court precedent, I believe the commercial speech doctrine, in its current form, fails to account for the realities of the modern world—a world in which personal, political, and commercial arenas no longer have sharply defined boundaries. My sentiments are not unique; many judges and academics have echoed them. (See, e.g., Kozinski & Banner, *The Anti-History and Pre-History of Commercial Speech* (1993) 71 Tex. L.Rev. 747; Kozinski & Banner, *Who's Afraid of Commercial Speech, supra*, 76 Va. L.Rev. at p. 627; Redish, *The First Amendment in the Marketplace: Commercial Speech and the Values of Free Expression* (1971) 39 Geo. Wash. L.Rev. 429.) Even some justices on the high court have recently questioned the validity of the distinction between commercial and noncommercial speech. (See *44 Liquormart, Inc. v. Rhode Island* (1996) 517 U.S. 484, 522 [116 S.Ct. 1495, 1518, 134 L.Ed.2d 711] (conc. opn. of Thomas, J.) ["I do not see a philosophical or historical basis for asserting that 'commercial' speech is of 'lower value' than 'noncommercial' speech"]; *id.* at p. 517 [116 S.Ct. at p. 1515] (conc. opn. of Scalia, J.) ["I share Justice Thomas's discomfort with the *Central Hudson* test"].) Nonetheless, the high court has apparently declined to abandon it. (See, e.g., *Greater New Orleans Broadcasting Assn., Inc. v. United States* (1999) 527 U.S. 173, 183 [119 S.Ct. 1923, 1929-1930, 144

---

[1] All further statutory references are to the Business and Professions Code.

L.Ed.2d 161, 164 A.L.R. Fed. 711] (*Greater New Orleans Broadcasting*) [applying the *Central Hudson* test to restrictions on commercial speech].) Given that the United States Supreme Court is not prepared to start over, we must try to make the commercial speech doctrine work—warts and all. To this end, I believe the high court needs to develop a more nuanced approach that maximizes the ability of businesses to participate in the public debate while minimizing consumer fraud.

## II

According to the majority, all speech containing the following three elements is commercial speech: (1) "a commercial speaker" (maj. opn., *ante*, at p. 963); (2) "an intended commercial audience" (*ibid.*); and (3) "representations of fact of a commercial nature" (*ibid.*). The first element is satisfied whenever the speaker is engaged in "the production, distribution, or sale of goods or services" "or someone acting on behalf of a person so engaged." (*Id.* at p. 960.) The second element is satisfied whenever the intended audience is "actual or potential buyers or customers of the speaker's goods or services, or persons acting for actual or potential buyers or customers, or persons (such as reporters or reviewers) likely to repeat the message to or otherwise influence actual or potential buyers or customers." (*Ibid.*) The third element is satisfied whenever "the speech consists of representations of fact about the business operations, products, or services of the speaker (or the individual or company that the speaker represents), made for the purpose of promoting sales of, or other commercial transactions in, the speaker's products or services." (*Id.* at p. 961.)

Although the majority constructed this limited-purpose test from its "close reading of the high court's commercial speech decisions" (maj. opn., *ante*, at p. 960), it conveniently dismisses those decisions that cast doubt on its formulation. As explained below, a closer review of the relevant case law reveals that the majority's test for commercial speech contravenes long-standing principles of First Amendment law.

First, the test flouts the very essence of the distinction between commercial and noncommercial speech identified by the United States Supreme Court. "If commercial speech is to be distinguished, it 'must be distinguished *by its content.*' " (*Bates v. State Bar of Arizona* (1977) 433 U.S. 350, 363 [97 S.Ct. 2691, 2699, 53 L.Ed.2d 810], italics added (*Bates*), quoting *Va. Pharmacy Bd. v. Va. Consumer Council* (1976) 425 U.S. 748, 761 [96 S.Ct. 1817, 1825, 48 L.Ed.2d 346] (*Va. Consumer Council*).) Despite this caveat, the majority distinguishes commercial from noncommercial speech using two criteria wholly unrelated to the speech's content: the identity of the

speaker and the intended audience. (See maj. opn., *ante*, at p. 960.) In doing so, the majority strays from the guiding principles espoused by the United States Supreme Court.

Second, the test contravenes a fundamental tenet of First Amendment jurisprudence by making the identity of the speaker potentially dispositive. As the United States Supreme Court stated long ago, "[the] identity of the speaker is not decisive in determining whether speech is protected" (*Pacific Gas & Elec. Co. v. Public Util. Comm'n* (1986) 475 U.S. 1, 8 [106 S.Ct. 903, 907, 89 L.Ed.2d 1] (plur. opn. of Powell, J.) (*Pacific Gas & Electric*)), and "speech does not lose its protection because of the corporate identity of the speaker" (*id.* at p. 16 [106 S.Ct. at p. 912]). This is because corporations and other speakers engaged in commerce "contribute to the 'discussion, debate, and the dissemination of information and ideas' that the First Amendment seeks to foster." (*Id.* at p. 8 [106 S.Ct. at p. 907], quoting *Bellotti, supra,* 435 U.S. at p. 783 [98 S.Ct. at p. 1419].) Thus, "[t]he inherent worth of the speech in terms of its capacity for informing the public does not depend upon *the identity of its source*, whether corporation, association, union, or individual." (*Bellotti*, at p. 777 [98 S.Ct. at p. 1416], italics added.) Despite these admonitions, the majority has made the identity of the speaker a significant, and potentially dispositive, factor in determining the scope of protection accorded to speech under the First Amendment. (See maj. opn., *ante*, at p. 960.) As a result, speech by "someone engaged in commerce" may receive less protection solely because of the speaker's identity. (*Ibid.*) Indeed, the majority's limited-purpose test makes the identity of the speaker dispositive whenever the speech at issue relates to the speaker's business operations, products, or services, in contravention of United States Supreme Court precedent. (See *Pacific Gas & Electric, supra,* 475 U.S. at p. 8 [106 S.Ct. at pp. 907-908] (plur. opn. of Powell, J.).)

Third, the test violates the First Amendment by stifling the ability of speakers engaged in commerce, such as corporations, to participate in debates over public issues. The United States Supreme Court has broadly defined public issues as those issues "about which information is needed or appropriate to enable the members of society to cope with the exigencies of their period." (*Thornhill v. Alabama* (1940) 310 U.S. 88, 102 [60 S.Ct. 736, 744, 84 L.Ed. 1093].) "The general proposition that freedom of expression upon public questions is secured by the First Amendment has long been settled . . . ." (*New York Times Co. v. Sullivan* (1964) 376 U.S. 254, 269 [84 S.Ct. 710, 720, 11 L.Ed.2d 686, 95 A.L.R.2d 1412] (*New York Times*).) "[S]peech on public issues occupies the ' "highest rung of the hierarchy of First Amendment values," ' and is entitled to special protection" (*Connick v. Myers* (1983) 461 U.S. 138, 145 [103 S.Ct. 1684, 1689, 75 L.Ed.2d 708]),

because such speech "is more than self-expression; it is the essence of self-government" (*Garrison v. Louisiana* (1964) 379 U.S. 64, 74-75 [85 S.Ct. 209, 216, 13 L.Ed.2d 125]). "The First and Fourteenth Amendments remove 'governmental restraints from the arena of public discussion, putting the decision as to what views shall be voiced largely into the hands of each of us, in the hope that use of such freedom will ultimately produce a more capable citizenry and more perfect polity . . . .'" (*Consolidated Edison Co. v. Public Serv. Comm'n of New York* (1980) 447 U.S. 530, 534 [100 S.Ct. 2326, 2331, 65 L.Ed.2d 319] (*Consolidated Edison*), quoting *Cohen v. California* (1971) 403 U.S. 15, 24 [91 S.Ct. 1780, 1787-1788, 29 L.Ed.2d 284].) Thus, the First Amendment "both fully protects and implicitly encourages" public debate on "'matters of public concern.'" (*Pacific Gas & Electric, supra*, 475 U.S. at p. 9 [106 S.Ct. at p. 908] (plur. opn. of Powell, J.), quoting *Thornill v. Alabama, supra*, 310 U.S. at p. 101 [60 S.Ct. at pp. 743-744].)

To ensure "uninhibited, robust, and wide-open" "debate on public issues" (*New York Times, supra*, 376 U.S. at p. 270 [84 S.Ct. at pp. 720-721]), the United States Supreme Court has recognized that some false or misleading speech must be tolerated. Although "[u]ntruthful speech, commercial or otherwise, has never been protected for its own sake" (*Va. Consumer Council, supra*, 425 U.S. at p. 771 [96 S.Ct. at p. 1830]), "[t]he First Amendment requires that we protect some falsehood in order to protect speech that matters" (*Gertz v. Robert Welch, Inc.* (1974) 418 U.S. 323, 341 [94 S.Ct. 2997, 3007, 41 L.Ed.2d 789] (*Gertz*)). The "erroneous statement is inevitable in free debate, and . . . it must be protected if the freedoms of expression are to have the 'breathing space' that they 'need to survive' . . . ." (*New York Times, supra*, 376 U.S. at pp. 271-272 [84 S.Ct. at p. 721], quoting *N.A.A.C.P. v. Button* (1963) 371 U.S. 415, 433 [83 S.Ct. 328, 338, 9 L.Ed.2d 405].) Because "a rule that would impose strict liability on a" speaker "for false factual assertions" in a matter of public concern "would have an undoubted 'chilling' effect" on speech "that does have constitutional value" (*Hustler Magazine v. Falwell* (1988) 485 U.S. 46, 52 [108 S.Ct. 876, 880, 99 L.Ed.2d 41]), "only those false statements made with the high degree of awareness of their probable falsity demanded by *New York Times* may be the subject of either civil or criminal sanctions" (*Garrison v. Louisiana, supra*, 379 U.S. at p. 74 [85 S.Ct. at p. 216]).

The majority contends its limited-purpose test for commercial speech does not violate these principles because false or misleading commercial speech may be prohibited "entirely." (Maj. opn., *ante*, at p. 953.) This logic is, however, faulty, because it erroneously assumes that false or misleading commercial speech as defined by the majority can never be speech about a

public issue. Under the majority's test, the content of commercial speech is limited only to representations regarding "business operations, products, or services." (Maj. opn., *ante*, at p. 961.) But business operations, products, or services may be public issues. For example, a corporation's business operations may be the subject of public debate in the media. These operations may even be a political issue as organizations, such as state, local, or student governments, propose and pass resolutions condemning certain business practices. Under these circumstances, the corporation's business operations undoubtedly become a matter of public concern, and speech about these operations merits the full protection of the First Amendment. (See *Thornhill v. Alabama, supra*, 310 U.S. at p. 102 [60 S.Ct. at p. 744].) Indeed, the United States Supreme Court has long recognized that speech on a public issue may be inseparable from speech promoting the speaker's business operations, products or services. (See *Thomas v. Collins, supra*, 323 U.S. at pp. 535-536 [65 S.Ct. at p. 325] [recognizing that a union representative could not discuss the benefits of unionism without hawking the union's services].)

The majority, however, creates an overbroad test that, taken to its logical conclusion, renders all corporate speech commercial speech. As defined, the test makes any public representation of fact by a speaker engaged in commerce about that speaker's products made for the purpose of promoting that speaker's products commercial speech. (See maj. opn., *ante*, at pp. 960-964.) A corporation's product, however, includes the corporation itself. Corporations are regularly bought and sold, and corporations market not only their products and services but also themselves. Indeed, business goodwill is an important asset of every corporation and contributes significantly to the sale value of the corporation. Because all corporate speech about a public issue reflects on the corporate image and therefore affects the corporation's business goodwill and sale value, the majority's test makes all such speech commercial notwithstanding the majority's assertions to the contrary. (See maj. opn., *ante*, at pp. 965-967.)

In so doing, the majority violates a basic principle of First Amendment law. (*Consolidated Edison, supra*, 447 U.S. at p. 535 [100 S.Ct. at p. 2332] [restrictions on the means by which a corporation "may participate in the public debate" "strike[] at the heart of the freedom to speak"].) By subjecting all corporate speech about business operations, products and services to the strict liability provisions of sections 17204 and 17535, the majority's limited-purpose test unconstitutionally chills a corporation's ability to participate in the debate over matters of public concern. (See *Garrison v. Louisiana, supra*, 379 U.S. at p. 74 [85 S.Ct. at pp. 215-216].) The chilling effect is exacerbated by the breadth of sections 17204 and 17535, which

"prohibit 'not only advertising which is false, but also advertising which[,] although true, is either actually misleading or *which has a capacity, likelihood or tendency to deceive or confuse the public.*'" (Maj. opn., *ante*, at p. 951, italics added, quoting *Leoni v. State Bar* (1985) 39 Cal.3d 609, 626 [217 Cal.Rptr. 423, 704 P.2d 183].) This broad definition of actionable speech puts a corporation "at the mercy of the varied understanding of [its] hearers and consequently of whatever inference may be drawn as to [its] intent and meaning." (*Thomas v. Collins, supra*, 323 U.S. at p. 535 [65 S.Ct. at p. 325].) Because the corporation could never be sure whether its truthful statements may deceive or confuse the public and would likely incur significant burden and expense in litigating the issue, "[m]uch valuable information which a corporation might be able to provide would remain unpublished . . . ." (*Bellotti, supra*, 435 U.S. at p. 785, fn. 21 [98 S.Ct. at p. 1420].) As the United States Supreme Court has consistently held, such a result violates the First Amendment. (*Ibid.*)

Finally, in singling out speakers engaged in commerce and restricting their ability to participate in the public debate, the majority unconstitutionally favors certain speakers over others. Corporations "have the right to be free from government restrictions that abridge [their] own rights in order to 'enhance the relative voice' of [their] opponents." (*Pacific Gas & Electric, supra*, 475 U.S. at p. 14 [106 S.Ct. at p. 910] (plur. opn. of Powell, J.), quoting *Buckley v. Valeo* (1976) 424 U.S. 1, 49 & fn. 55 [96 S.Ct. 612, 649, 46 L.Ed.2d 659].) The First Amendment does not permit favoritism toward certain speakers "based on the identity of the interests that [the speaker] may represent." (*Bellotti, supra*, 435 U.S. at p. 784 [98 S.Ct. at p. 1420].) Indeed, "self-government suffers when those in power suppress competing views on public issues 'from diverse and antagonistic sources.'" (*Id.* at p. 777, fn. 12 [98 S.Ct. at p. 1416], quoting *Associated Press v. United States* (1945) 326 U.S. 1, 20 [65 S.Ct. 1416, 1424, 89 L.Ed. 2013].) The majority, however, does just that. Under the majority's test, only speakers engaged in commerce are strictly liable for their false or misleading representations pursuant to sections 17204 and 17535. Meanwhile, other speakers who make the same representations may face no such liability, regardless of the context of their statements. Neither United States Supreme Court precedent nor our precedent countenances such favoritism in doling out First Amendment rights.

### III

The majority's limited-purpose test is not only problematic in light of controlling high court precedent, the test appears to conflict with the analysis used by other courts in analogous contexts. These conflicts belie the majority's claim of doctrinal consistency and underscore the illusory nature of its so-called solution to the commercial speech quandary.

For example, the majority opinion conflicts with *Gordon & Breach Science Publishers v. AIP* (S.D.N.Y. 1994) 859 F.Supp. 1521 (*Gordon & Breach*). In *Gordon & Breach*, the defendant, a nonprofit publisher of scientific journals, published scientific articles touting its journals as "both less expensive and more scientifically important than those of for-profit publishers such as" the plaintiff. (*Id.* at p. 1525.) The defendant, as part of an advertising campaign designed to promote its journals, touted and defended the conclusions of these articles by, among other things, issuing press releases and writing letters to the editor responding to attacks on these articles. (*Id.* at pp. 1526-1527.) In light of these promotional activities, the plaintiff sued the defendant for false advertising under the Lanham Trademark Act (15 U.S.C. § 1125(a)) and New York law.

In determining whether the defendant's advertising campaign constituted commercial speech, the district court identified the following dilemma: how to characterize "speech which, from one perspective, presents the aspect of protected, noncommercial speech addressing a significant public issue, but which, from another perspective, appears primarily to be speech 'proposing a commercial transaction.' " (*Gordon & Breach, supra,* 859 F.Supp. at p. 1539.) After analyzing the relevant United States Supreme Court precedent, the court concluded that the articles, press releases and letters to the editor constituted noncommercial speech fully protected by the First Amendment. (See *id.* at pp. 1543-1544.)[2] According to the court, this speech fell "too close to core First Amendment values to be considered 'commercial advertising or promotion' under the Lanham Act." (*Id.* at p. 1544.)

Application of the majority's test would, however, result in a different outcome. The defendant was engaged in commerce; it sold journals. The intended audience was undoubtedly potential customers. The articles, press releases and letters contained representations of fact about the defendant's products—its journals. Thus, they contain the three elements of commercial speech identified by the majority. The majority would therefore classify this speech as commercial speech even though it constitutes "fully protected commentary on an issue of public concern." (*Gordon & Breach, supra,* 859 F.Supp. at p. 1544.)

Similarly, the majority's test creates a conflict with *Oxycal Laboratories, Inc. v. Jeffers* (S.D.Cal. 1995) 909 F.Supp. 719. In *Oxycal,* the defendants published a book that denigrated the plaintiffs' products while promoting the defendants' products. The defendants allegedly promoted the book in an

---

[2]The court did find that the defendant's distribution of preprints of the articles to potential customers and its repeated dissemination of the conclusions of these articles to potential customers constituted commercial speech. (*Gordon & Breach, supra,* 859 F.Supp. at p. 1544.)

effort to boost the sales of their own products. The plaintiffs sued, alleging false advertising. (See *id.* at pp. 720-721.) Finding this case easy, the court concluded that the book was noncommercial speech because there were "sufficient noncommercial motivations" notwithstanding the commercial motivations. (*Id.* at pp. 724-725.) To the extent the book contained commercial elements promoting the defendants' products, these commercial elements were "intertwined" with and secondary to the noncommercial elements. (*Id.* at p. 725.)

Once again, the majority's test would yield a contrary result. The defendants were engaged in commerce, and the intended audience for the book was potential consumers. The book contained representations of fact about the defendants' products, and the defendants undoubtedly made these representations for the purpose of promoting their products. Thus, under the majority's test, the book was commercial speech, and the defendants would have been strictly liable for any false or misleading statements about their products in the book.

Although we are not bound by these decisions, they are instructive and highlight the deficiencies in the majority's limited-purpose test for commercial speech. In divining a new test for commercial speech, the majority finds a deceptively simple answer to a complicated question. Unfortunately, the answer is flawed. By failing to recognize that a speaker's business operations, products, or services may be matters of public concern, the majority ignores controlling principles of First Amendment law. As a result, the majority erroneously draws a bright line when "a broader and more nuanced inquiry" is required. (*Gordon & Breach, supra,* 859 F.Supp. at p. 1537; see also *id.* at p. 1540, fn. 7.)

### IV

Of course, my rejection of the majority's limited-purpose test does not resolve the central issue in this case: What level of protection should be accorded to Nike's speech under the First Amendment? To answer this question, this court, as the majority correctly notes, must determine whether Nike's speech is commercial or noncommercial speech. Following the existing framework set up by the United States Supreme Court, I would conclude that Nike's speech is more like noncommercial speech than commercial speech because its commercial elements are inextricably intertwined with its noncommercial elements. Thus, I would give Nike's speech the full protection of the First Amendment.

When determining whether speech is commercial or noncommercial, courts must "ensure that speech deserving of greater constitutional protection is not inadvertently suppressed." (*Bolger, supra,* 463 U.S. at p. 66 [103

S.Ct. at p. 2880].) In following this philosophy in cases involving hybrid speech containing both commercial and noncommercial elements, the United States Supreme Court has assessed the separability of these elements to determine the proper level of protection. If the commercial elements are separable from the noncommercial elements, then the speech is commercial and receives lesser protection. Thus, advertising that merely "links a product to a current public debate" is still commercial speech notwithstanding its noncommercial elements. (*Central Hudson, supra*, 447 U.S. at p. 563, fn. 5 [100 S.Ct. at p. 2349].) Where the speaker may comment on a public issue without promoting its products or services, the speech is also commercial, even if the speaker combines a commercial message with a noncommercial message. (See *Board of Trustees, State Univ. of N. Y. v. Fox* (1989) 492 U.S. 469, 474 [109 S.Ct. 3028, 3031, 106 L.Ed.2d 388] (*Fox*) [speaker did not have to combine its sales pitch for Tupperware with its home economics lessons].) Indeed, "[a]dvertisers should not be permitted to immunize false or misleading product information from government regulation simply by including references to public issues." (*Bolger*, at p. 68 [103 S.Ct. at p. 2881].)

The United States Supreme Court has, however, recognized that commercial speech may be "inextricably intertwined" with noncommercial speech in certain contexts. (*Riley, supra*, 487 U.S. at p. 796 [108 S.Ct. at p. 2677].) Where regulation of the commercial component of certain speech would stifle otherwise protected speech, "we cannot parcel out the speech, applying one test to one phrase and another test to another phrase. Such an endeavor would be both artificial and impractical." (*Ibid.*) In such cases, courts must apply the "test for fully protected expression" rather than the test for commercial speech.[3] (*Riley*, at p. 796 [108 S.Ct. at p. 2677].)

Although the United States Supreme Court has mostly found this intertwining of commercial and noncommercial speech in the charitable solicitation context,[4] it has also done so in a factual context analogous to the one

---

[3]The majority's attempts to distinguish *Riley* are not persuasive. First, "charitable solicitations" *do* "involve factual representations about a product or service that is offered for sale" (maj. opn., *ante*, at pp. 966-967), where, as in *Riley*, the charitable solicitations are made by professional fundraisers who solicit contributions for a fee (see *Riley, supra*, 487 U.S. at pp. 784-785 [108 S.Ct. at pp. 2671-2672]). Second, *Fox* does not preclude the application of *Riley* in this case. (See maj. opn., *ante*, at pp. 966-967.) It *is* "impossible for Nike to address" certain public issues without addressing its own labor practices (maj. opn., *ante*, at p. 967), because these practices are the public issue and symbolize the current debate over overseas labor exploitation and economic globalization (see, *post*, at pp. 990-992).

[4](See, e.g., *Riley, supra*, 487 U.S. at p. 796 [108 S.Ct. at p. 2677]; *Secretary of State of Md. v. J. H. Munson Co.* (1984) 467 U.S. 947, 959-960 [104 S.Ct. 2839, 2848-2849, 81 L.Ed.2d 786]; *Village of Schaumburg v. Citizens for Better Environ.* (1980) 444 U.S. 620, 632 [100

presented here. In *Thomas v. Collins*, *supra*, 323 U.S. 516,[5] the United States Supreme Court held that a speech made by a union representative promoting the union's services and inviting workers to join constituted noncommercial speech fully protected by the First Amendment. (*Thomas*, at pp. 536-537 [65 S.Ct. at pp. 325-326].) Although the court acknowledged that the speech promoted the services of the union and sought to solicit new members, it found that these commercial elements were inextricably intertwined with the noncommercial elements addressing a public issue—unionism. (See *id.* at pp. 535-536 [65 S.Ct. at p. 325].) "The feat would be incredible for a national leader, addressing such a meeting, lauding unions and their principles, urging adherence to union philosophy, not also and thereby to suggest attachment to the union by becoming a member." (*Id.* at p. 535 [65 S.Ct. at p. 325].) Indeed, "whether words intended and designed to fall short of invitation would miss that mark is a question both of intent and of effect. No speaker, in such circumstances, safely could assume that anything he might say upon the general subject would not be understood by some as an invitation." (*Ibid.*)

Finding that the commercial elements of the union representative's speech should be accorded the full protection of the First Amendment, the court concluded that distinguishing between the speech's commercial and non-commercial elements "offers no security for free discussion." (*Thomas v. Collins*, *supra*, 323 U.S. at p. 535 [65 S.Ct. at p. 325].) "In these conditions," making such a distinction "blankets with uncertainty whatever may be said. It compels the speaker to hedge and trim." (*Ibid.*) "When legislation or its application can confine labor leaders on such occasions to innocuous and abstract discussion of the virtues of trade unions and so becloud even this with doubt, uncertainty and the risk of penalty, freedom of speech for them will be at an end. A restriction so destructive of the right of public discussion . . . is incompatible with the freedoms secured by the First Amendment." (*Id.* at pp. 536-537 [65 S.Ct. at p. 325].)

S.Ct. 826, 833-834, 63 L.Ed.2d 73]; see also *Meyer v. Grant* (1988) 486 U.S. 414, 422, fn. 5 [108 S.Ct. 1886, 1892, 100 L.Ed.2d 425] [finding the solicitation of signatures for a petition to be noncommercial speech].)

[5]The majority contends *Thomas* and *Thornhill* are not relevant because "[t]he United States Supreme Court issued these decisions three decades before it developed the modern commercial speech doctrine in *Bigelow v. Virginia* [(1975)] 421 U.S. 809 [95 S.Ct. 2222, 44 L.Ed.2d 600], and *Va.* [*Consumer Council*], *supra*, 425 U.S. 748." (Maj. opn., *ante*, at p. 965.) The majority, however, conveniently neglects to mention that both *Bigelow* and *Va. Consumer Council* cite *Thomas* and *Thornhill* with approval. (See *Va. Consumer Council*, *supra*, 425 U.S. at pp. 758-759 [96 S.Ct. at p. 1824] [citing *Thomas* as a case where the court "has stressed that communications to which First Amendment protection was given were not 'purely commercial' "]; *id.* at pp. 757, 762 [96 S.Ct. at pp. 1823, 1825-1826]; *Bigelow*, *supra*, 421 U.S. at p. 816 [95 S.Ct. at pp. 2229-2230].) Thus, the United States Supreme Court, in developing the commercial speech doctrine, did not intend to overrule or diminish the relevance of *Thomas* and *Thornhill*. In any event, the binding effect of a high court opinion does not diminish with age.

This case presents a similar scenario because Nike's overseas labor practices have become a public issue. According to the complaint, Nike faced a sophisticated media campaign attacking its overseas labor practices. As a result, its labor practices were discussed on television news programs and in numerous newspapers and magazines. These discussions have even entered the political arena as various governments, government officials and organizations have proposed and passed resolutions condemning Nike's labor practices.[6] Given these facts, Nike's overseas labor practices were undoubtedly a matter of public concern, and its speech on this issue was therefore "entitled to special protection." (*Connick v. Myers, supra,* 461 U.S. at p. 145 [103 S.Ct. at p. 1689].) Because Nike could not comment on this public issue *without* discussing its overseas labor practices, the commercial elements of Nike's representations about its labor practices were inextricably intertwined with their noncommercial elements. (See *Riley, supra,* 487 U.S. at p. 796 [108 S.Ct. at p. 2677].) As such, these representations must be fully protected as noncommercial speech in the factual context presented here. (See *Thomas v. Collins, supra,* 323 U.S. at pp. 535-536 [65 S.Ct. at p. 325].)

The majority's assertion that Nike's representations about its overseas labor practices are distinct from its comments on "policy questions" is simply wrong. (Maj. opn., *ante,* at p. 966.) The majority contends Nike can still comment on the policy issues implicated by its press releases and letters because it can generally discuss "the degree to which domestic companies should be responsible for working conditions in factories located in other countries, or what standards domestic companies ought to observe in such factories, or the merits and effects of economic 'globalization' generally . . . ." (*Ibid.*) The majority, however, conveniently forgets that Nike's overseas labor practices *are* the public issue. (See *ante,* at p. 990.) Thus,

---

[6](See, e.g., Cleeland, *Market Savvy Students Give Sweatshop Fight the College Try,* L.A. Times (Apr. 22, 1999) p. C1 ["a half-dozen universities have adopted stringent codes of conduct for manufacturers of apparel that bear their logos; many more are reexamining their policies"]; Martinez, *Student Protests Unlikely to Kill UA-Nike Deal,* Ariz. Daily Star (Jan. 25, 1998) p. 1B ["Hundreds of UA students have signed a petition protesting the university's impending contract with Nike because of alleged human rights abuses in the company's factories overseas"]; *Stepping Up Nike Criticism,* Newsday (Nov. 10, 1997) p. A22 ["More than 50 lawmakers yesterday called on Nike Inc. to improve labor standards in Third World factories and to employ more people in the United States"]; Stancill, *Students to Keep Pressure on Nike,* Raleigh News & Observer (Nov. 8, 1997) p. B1 [students signing and circulating petitions against Nike]; Jeffcott, *Consumer Power Takes on Brand Names, Big Retailers* (Sept. 7, 1997) 21 Catholic New Times 14, 15 [as part of the global movement to end sweatshops, various groups are pressuring "city councils to adopt 'no sweat resolutions' " directed at multinational companies like Nike]; Himelstein, *Going Beyond City Limits?,* Business Week (July 7, 1997) p. 98 [at least 10 cities have passed no-sweatshop ordinances directed at multinational companies like Nike]; Klein, *Just Doing It Lands Nike in Ethical Hot Water,* Toronto Star (Feb. 24, 1997) p. A19 [city council passes resolution banning the use of child-made Nike soccer balls].)

general statements about overseas labor exploitation and economic global-ization do not provide Nike with a meaningful way to participate in the public debate over *its* overseas labor practices. (See *Thomas v. Collins*, *supra*, 323 U.S. at pp. 536-537 [65 S.Ct. at pp. 325-326].)

Even if the majority correctly characterizes the public issues implicated by Nike's press releases and letters, its assertion is still wrong. In light of the sophisticated media campaign directed at Nike's overseas labor practices and the close association between Nike's labor practices and the public debate over overseas labor exploitation and economic globalization, Nike could not comment on these public issues without discussing its own labor practices. Indeed, Nike could hardly condemn exploitation of overseas workers and discuss the virtues of economic globalization without implying that it helps overseas workers and does not exploit them. By limiting Nike to "innocuous and abstract discussion," the majority has effectively destroyed Nike's "right of public discussion." (*Thomas v. Collins, supra*, 323 U.S. at pp. 536-537 [65 S.Ct. at pp. 325-326].) Under these circumstances, Nike no longer "has the full panoply of protections available to its direct comments on public issues . . . ." (*Bolger, supra*, 463 U.S. at p. 68 [103 S.Ct. at p. 2881], fn. omitted.) Accordingly, the factual representations in Nike's press releases and letters are fully protected under current First Amendment jurisprudence. (See *Thomas v. Collins*, at pp. 536-537 [65 S.Ct. at pp. 325-326]; *Gordon & Breach, supra*, 859 F.Supp. at p. 1544.)

Such a conclusion is consistent with the commercial speech decisions of the United States Supreme Court. Most of these decisions involve core commercial speech that does "no more than propose a commercial transac-tion."[7] (*Pittsburgh Press, supra*, 413 U.S. at p. 385 [93 S.Ct. at p. 2558].) Because speech that just proposes a commercial transaction, by definition,

[7](See, e.g., *Lorillard Tobacco Co. v. Reilly* (2001) 533 U.S. 525, 536 [121 S.Ct. 2404, 2411-2412, 150 L.Ed.2d 532] [oral, written, graphic, or pictorial advertisements for smoke-less tobacco and cigars]; *Greater New Orleans Broadcasting, supra*, 527 U.S. at p. 176 [119 S.Ct. at pp. 1926-1927] [radio broadcasts of promotional ads for casino gambling]; *44 Liquormart, Inc. v. Rhode Island, supra*, 517 U.S. at pp. 492-493 [116 S.Ct. at pp. 1502-1503] (plur. opn. of Steven, J.) [ads referencing the price of alcohol products]; *Rubin v. Coors Brewing Co.* (1995) 514 U.S. 476, 481 [115 S.Ct. 1585, 1589, 131 L.Ed.2d 532] [parties conceded that labels on alcohol products listing alcohol content was commercial speech]; *Ibanez v. Florida Dept. of Business and Professional Regulation, Bd. of Accountancy* (1994) 512 U.S. 136, 138 [114 S.Ct. 2084, 2086, 129 L.Ed.2d 118] [ads and promotional communi-cations listing professional affiliations of attorney]; *United States v. Edge Broadcasting Co.* (1993) 509 U.S. 418, 421 [113 S.Ct. 2696, 2700-2701, 125 L.Ed.2d 345] [radio broadcasts advertising lotteries]; *Edenfield v. Fane, supra*, 507 U.S. at pp. 763-764 [113 S.Ct. at pp. 1796-1797] [in-person solicitations for business by certified public accountants]; *Discovery Network, supra*, 507 U.S. at pp. 416, 424 [113 S.Ct. at pp. 1509-1510, 1514] [parties conceded that magazines were commercial speech]; *Posadas de Puerto Rico Assoc. v. Tourism Co.* (1986) 478 U.S. 328, 330 [106 S.Ct. 2968, 2971, 92 L.Ed.2d 266] [casino ads]; *In re*

only promotes the sale of a product or service and does not address a public issue, these decisions are inapposite.

The United States Supreme Court decisions finding hybrid speech containing both commercial and noncommercial elements to be commercial are also distinguishable. In these cases, the court found that the commercial elements of the speech were separable from its noncommercial elements and were therefore unnecessary for conveying the noncommercial message. (See *Fox, supra,* 492 U.S. at p. 474 [109 S.Ct. at p. 3031] [sales pitch for Tupperware was not an indispensable part of the noncommercial speech about home economics]; *Zauderer v. Office of Disciplinary Counsel* (1985) 471 U.S. 626, 637, fn. 7 [105 S.Ct. 2265, 2274-2275, 85 L.Ed.2d 652] [client solicitations were separable from noncommercial statements describing legal rights].) Because the commercial message was merely linked to—and not inextricably intertwined with—the noncommercial message, the court concluded that restrictions on the commercial message would not stifle the speaker's ability to engage in protected speech. As explained above, this case is different. Nike's overseas business operations have become the public issue, and Nike cannot comment on important public issues like overseas worker exploitation and economic globalization without implicating its own labor practices. (See *ante,* at pp. 990-992.) Thus, the commercial elements of Nike's press releases, letters, and other documents were inextricably intertwined with their noncommercial elements, and they must be fully protected as noncommercial speech. (See *Riley, supra,* 487 U.S. at p. 796 [108 S.Ct. at p. 2677]; *Thomas v. Collins, supra,* 323 U.S. at pp. 536-537 [65 S.Ct. at pp. 325-326]; *Gordon & Breach, supra,* 859 F.Supp. at p. 1544.)

Finally, *Bolger,* the primary case relied on by the majority, is distinguishable. In *Bolger,* a contraceptive manufacturer wished to mail, among other things, informational pamphlets that discussed the problem of venereal disease and the benefits of condoms and referenced the manufacturer. The United States Postal Service banned the mailings, and the manufacturer challenged the constitutionality of the ban. (See *Bolger, supra,* 463 U.S. at pp. 62-63 [103 S.Ct. at pp. 2877-2878].) In assessing the constitutionality of the ban, the United States Supreme Court concluded that the informational

---

*R.M.J.* (1982) 455 U.S. 191, 196-197 [102 S.Ct. 929, 934, 71 L.Ed.2d 64] [print ads and professional announcement cards]; *Central Hudson, supra,* 447 U.S. at p. 562, fn. 5 [100 S.Ct. at pp. 2349-2350] [ads "clearly intended to promote sales"]; *Friedman v. Rogers* (1979) 440 U.S. 1, 11 [99 S.Ct. 887, 895, 59 L.Ed.2d 100] [trade name]; *Ohralik, supra,* 436 U.S. at p. 454 [98 S.Ct. at pp. 1917-1918] [in-person solicitation of business by lawyer]; *Bates, supra,* 433 U.S. at p. 354 [97 S.Ct. at p. 2699] [ads containing pricing information]; *Va. Consumer Council, supra,* 425 U.S. at pp. 760-761 [96 S.Ct. at pp. 1824-1825] [ads containing drug prices]; *Pittsburgh Press Co. v. Human Relations Comm'n* (1973) 413 U.S. 376, 379 [93 S.Ct. 2553, 2555-2556, 37 L.Ed.2d 669] (*Pittsburgh Press*) [job ads].)

pamphlets constituted commercial speech "notwithstanding the fact that they contain discussions of important public issues." (*Id.* at pp. 67-68 [103 S.Ct. at pp. 2880-2881], fn. omitted.) Unlike Nike's overseas business operations, however, the products at issue in *Bolger* had not become a public issue. Moreover, in the factual context of *Bolger*, the manufacturer could have commented on the issues of venereal disease and family planning through avenues other than promotional mailings and without referencing its own products. By contrast, Nike has *no* other avenue for defending its labor practices, given the breadth of sections 17204 and 17535 (see maj. opn., *ante*, at pp. 950-951), and Nike cannot comment on the issues of labor exploitation and economic globalization without referencing its own labor practices (see *ante*, at pp. 990-992). Given these differences, *Bolger* does not compel the majority's conclusion.

Constrained by the United States Supreme Court's current formulation of the commercial speech doctrine, I would therefore conclude that Nike's press releases, letters, and other documents defending its overseas labor practices are noncommercial speech. Based on this conclusion, I would find the application of sections 17204 and 17535 to Nike's speech unconstitutional. Accordingly, I would affirm the judgment of the Court of Appeal.

V

The majority attempts to refute the application of the inextricably intertwining doctrine by factually distinguishing *Thomas* and *Thornhill*. The majority's proposed distinction, however, exposes a major flaw in its analysis. According to the majority, *Thomas* and *Thornhill* do not control because they neither address "the validity of a law prohibiting false or misleading speech" (maj. opn., *ante*, at p. 965) nor bar states from prohibiting "false and misleading factual representations, made for purposes of maintaining and increasing sales and profits, about the speaker's own products, services, or business operations" (*ibid.*). The majority apparently finds this distinction persuasive because it previously concluded that Nike's speech is only "commercial speech for purposes of applying state laws designed to prevent false advertising and other forms of commercial deception." (*Id.* at p. 964.)

Although the logic is difficult to follow, the majority apparently characterizes corporate speech as commercial or noncommercial based on whether the speech is false or misleading. Such an outcome, however, betrays a fundamental misunderstanding of the issue presented in this case. As the majority acknowledges, state laws may only prohibit false or misleading speech if that speech is commercial. Thus, the critical question is whether the speech at issue is commercial or noncommercial speech. Whether the statutes at issue are "designed to prevent false advertising and other forms of

commercial deception" has no bearing on this question. (Maj. opn., *ante*, at p. 964.) The majority's assertion that Nike's statements are commercial speech because the application of false advertising laws is at issue therefore makes no sense. (See *ibid.*) Indeed, the majority begs the question by making false or misleading corporate speech commercial speech because it is false or misleading.

## VI

In today's world, the difference between commercial and noncommercial speech is not black and white. Due to the growing politicization of commercial matters and the increased sophistication of advertising campaigns, the intersection between commercial and noncommercial speech has become larger and larger. As this gray area expands, continued adherence to the dichotomous, all-or-nothing approach developed by the United States Supreme Court will eventually lead us down one of two unappealing paths: either the voices of businesses in the public debate will be effectively silenced, or businesses will be able to dupe consumers with impunity.

Rather than continue down this path, I believe the high court must reassess the commercial speech doctrine and develop a more nuanced inquiry that accounts for the realities of today's commercial world. Without abandoning the categories of commercial and noncommercial speech, the court could develop an approach better suited to today's world by recognizing that not all speech containing commercial elements should be equal in the eyes of the First Amendment.

For example, the United States Supreme Court could develop an intermediate category of protected speech where commercial and noncommercial elements are closely intertwined. In light of the conflicting constitutional principles at play, this intermediate category could receive greater protection than commercial speech but less protection than noncommercial speech. Under such an approach, false or misleading speech that falls within the intermediate category could be actionable so long as states do not impose liability without fault. (Cf. *Gertz, supra*, 418 U.S. at p. 347 [94 S.Ct. at p. 3010] ["so long as they do not impose liability without fault, the States may define for themselves the appropriate standard of liability for a publisher or broadcaster of defamatory falsehood injurious to a private individual"].)

Alternatively, the court could abandon its blanket rule permitting the proscription of all false or misleading commercial speech. Instead, the court could devise a test for determining whether governmental restrictions on false or misleading speech with commercial elements survive constitutional scrutiny. In doing so, the court could develop a more nuanced approach that

maximizes the ability of businesses to participate in the public debate without allowing consumer fraud to run rampant.

Even if these suggestions are unworkable or problematic, the practical realities of today's commercial world require a new " 'accommodation between [First Amendment] concern[s] and the limited state interest present in the context of' " strict liability actions targeting speech with inextricably intertwined commercial and noncommercial elements. (*Dun & Bradstreet, supra*, 472 U.S. at p. 756 [105 S.Ct. at p. 2944] (plur. opn. of Powell, J.), quoting *Gertz, supra*, 418 U.S. at p. 343 [94 S.Ct. at p. 3008].) The high court long ago recognized that "[t]he diverse motives, means, and messages of advertising may make speech 'commercial' in widely varying degrees." (*Bigelow v. Virginia, supra*, 421 U.S. at p. 826 [95 S.Ct. at p. 2235].) Given the growing intersection between advertising and noncommercial speech, such as political, literary, scientific and artistic expression, this observation is equally cogent where the commercial speech is false or misleading.

I realize the task is not easy. Indeed, Justice Scalia has recently alluded to the intractability of the problem. (See *44 Liquormart v. Rhode Island, supra*, 517 U.S. 484, 518 [116 S.Ct. at p. 1515] (conc. opn. of Scalia, J.) ["I do not believe we have before us the wherewithal to declare *Central Hudson* wrong—or at least the wherewithal to say what ought to replace it"].) Nonetheless, a new accommodation of the relevant constitutional concerns is possible, and the United States Supreme Court can and should devise a more nuanced approach that guarantees the ability of speakers engaged in commerce to participate in the public debate without giving these speakers free rein to lie and cheat.

For example, such an accommodation could permit states to bar *all* false or misleading representations about the characteristics of a product or service—i.e., the efficacy, quality, value, or safety of the product or service—without justification even if these characteristics have become a public issue. In such a situation, the governmental interest in protecting consumers from fraud is especially strong because these representations address the fundamental questions asked by every consumer when he or she makes a buying decision: does the product or service work well and reliably, is the product or service harmful and is the product or service worth the cost? Moreover, these representations are the traditional target of false advertising laws. Thus, the strong governmental interest in this context trumps any First Amendment concerns presented by a blanket prohibition on such false or misleading representations.

By contrast, the governmental interest in protecting against consumer fraud is less strong if the representations are unrelated to the characteristics

of the product or service. In some situations involving these representations, the First Amendment concerns *may* trump this governmental interest. A blanket prohibition of false or misleading representations in such a situation would be unconstitutional because the prohibition may stifle the ability of businesses to comment on public issues. Indeed, this case offers a prime example. Making Nike strictly liable for any false or misleading representations about its labor practices stifles Nike's ability to participate in a public debate *initiated by others*. Accommodating the competing interests in this context precludes the blanket prohibition favored by the majority. Although strict liability is inappropriate, an actual malice standard may be too high because these representations undoubtedly influence some consumers in their buying decisions, and the government has a strong interest in minimizing consumer deception. Thus, a well-crafted test could give states the flexibility to define the standard of liability for false or misleading misrepresentations in this context so long as the standard is not strict liability.[8] (Cf. *Gertz, supra,* 418 U.S. at p. 347 [94 S.Ct. at pp. 3010-3011].)

## VII

The majority accuses me of searching for my own "magic formula or incantation" because I urge a reevaluation of the commercial speech doctrine. (Maj. opn, *ante*, at p. 969.) To this charge, I plead guilty. Unlike the majority, which finds nothing unsettling about doctrinal incoherence, I readily acknowledge that some wizardry may be necessary if courts are to adapt the commercial speech doctrine to the realities of today's commercial world. Unfortunately, Merlin and Gandalf are busy, so the United States Supreme Court will have to fill the gap.

Although I make these magical references in jest, my point is serious: the commercial speech doctrine needs and deserves reconsideration and this is as good a place as any to begin. I urge the high court to do so here.

Respondents' petition for a rehearing was denied July 31, 2002, and on May 22, 2002, the opinion was modified to read as printed above. Brown, J., did not participate therein. Baxter, J., and Chin, J., were of the opinion that the petition should be granted.

---

[8]States may, however, adopt a strict liability standard for false and misleading representations unrelated to the characteristics of a product or service where the representations are not inextricably tied to a public issue.